WELCH, Judge.
The appellant, Christie Michelle Scott, was indicted for three counts of capital murder in connection with a fire at her house that resulted in the death of her six-year-old son Mason. Count Í of the indictment charged that Scott murdered Mason for pecuniary gain or other valuable consideration, i.e., the proceeds of a life-insurance policy, a violation of § 13A-5-40(a)(7), Ala.Code 1975; Count II charged that Scott murdered Mason during the course of an arson in the first degree, a violation of § 13A-5-40(a)(9), Ala.Code 1975; and Count III charged that Scott murdered a child under the age of 14, a violation of § 13A-5-40(a)(15), Ala.Code 1975. A jury found Scott guilty on all counts and recommended, by a vote of 7 to 5, that Scott be sentenced to life imprisonment without the possibility of parole. The circuit court held a separate sentencing hearing and sentenced Scott to death. This appeal followed.
More than 70 witnesses testified in the State’s case-in-chief. The evidence tended to show that in the early morning hours of August 16, 2008, a fire was set in the Scott house and that Mason died as a result of the fire. Dr. Emily Ward, a pathologist with the Alabama Department of Forensic Sciences, testified that Mason died from smoke in his airway and thermal burns.
At the time of the fire, Scott and her four-year-old son Noah were sleeping in Scott’s bedroom, Mason was in the boys’ *404 bedroom, and Jeremy Scott, Scott’s husband, was not at home and had been out of town for several weeks. Sgt. Brian Shack-elford of the Russellville Police Department testified that he arrived minutes after the emergency call, that he kicked open the back door, and that he was only able to make it four or five feet inside the house because of the heat and smoke. Firefighters testified that after extinguishing the fire they searched the house several times before they were able to identify Mason’s badly charred body.
The Scott’s neighbor, Jennifer Davidson, testified that her doorbell rang around 2:30 a.m. on August 16, 2008. She opened the door and found Scott and Noah. Scott told her that her house was on fire. Davidson went to the back of the house to telephone emergency 911 because, she said, the telephone in the front of the house was not working. When she got back to the front door, she said, Scott told her that her other son, Mason, was still in the house. Davidson telephoned 911 again to inform them that a child was still in the house. Emergency 911 records showed that the first call was made at 2:33:17 on the morning of August 16 and that the second call was made at 2:35:48 — two and one half minutes later.
After police and firefighters arrived at the scene, Davidson stayed with Scott. Davidson testified that when Scott was in the ambulance Scott said, “Don’t call Jeremy. Don’t call Jeremy. He’ll blame me or he’ll try to hurt his self.” (R. 998.) Davidson - also heard Scott ask what fire marshal was at the scene.- Scott said that she did not like one of the fire marshals because he had worked her other house fire. Davidson also testified that Scott was fully dressed and that at one point while they were in the ambulance Scott patted her pant pocket and pulled out a cell phone and said: “I had my cell phone the whole time. I could have called 911.” (R. 997-98.)
Davidson’s boyfriend, Brian Copeland, testified that Scott came to the door of the house he shared with Davidson in the early morning hours of August 16 and told them that her house was on fire. Copeland ran to the Scotts’ house to try and find a way inside to help Mason. Copeland said that Scott told him that all the doors were locked and there was no way to get inside the house, that Scott did not enter any numbers in the keypad to open the garage door in his presence, that he did not enter any numbers in the keypad, and that he did not have to restrain Scott to prevent her from going into the house. These statements were inconsistent with Scott’s account of the events on August 16, 2008.
An emergency medical technician with Pleasant Bay Ambulance Service, Elzie Malone, testified that he responded to the fire. He said that Scott told him that she was alright and that she did not need to go to the hospital. Malone said that Scott then said: “How am I going to tell Jeremy that I have let his baby die?” (R. 1061.)
Several officials testified concerning a statement that Scott’s father’s, Donald Bray, made to Scott when he arrived at the scene of the fire. William Crenshaw, a volunteer firefighter, testified that when Scott’s father arrived he said: “What the hell have you done with my grandbabies?” (R. 1291.) Sgt. Shackelford testified that Scott’s father said: “Oh, my God. What have you done to my babies?” (R. 1260.)
Jerry Yarborough, a paramedic with Pleasant Bay Ambulance Service, testified that when Scott’s father arrived at the scene he was upset and said to Scott: “Where’s my babies? Oh, no, not my babies. What have you done?” (R. 1126.) When Yarborough tried to calm Scott down, Yarborough testified, Scott said to him “You don’t understand. I killed his *405 [Jeremy’s] baby.” (R. 1128.) Yarborough also testified that Scott said that she didn’t know how someone could be so unlucky as to have two fires in three years and “I hope it ain’t that one [the fire marshal] from Colbert County. I don’t want him here.” (R. 1128.)
Cpt. Steve Thornton with the Russell-ville Fire Department testified that he arrived at the scene after the fire had been extinguished. The fire, he said, originated in Mason’s and Noah’s bedroom. He said that some of the electrical outlets from the bedroom were cut out of the wall in his presence, that each outlet was cut at a different length to identify it, and that the outlets were photographed from all angles. One outlet, he said, the outlet that was behind Mason’s bed could not be located; however, numerous photographs of this outlet had been made. Thornton said that firefighters sifted through the fire debris for 8 to 10 hours but were unable to locate this missing outlet.
Dolan Gassett, a deputy fire marshal, testified that he found a disabled smoke detector in the hallway outside the boys’ bedroom. (R. 1818.) Morris Brown, a former firearms and toolsmark expert with the Alabama Department of Forensic Sciences, testified that in his opinion the smoke detector had been forcibly removed, or pulled from the wall, before the fire started and it was lying on the floor, undamaged by the fire. He said: “[S]ome force acted upon the wires enough to cause the tearing of this housing and caused the collateral abrasion of the wire.” (R. 2399-40.) There was evidence indicating that everything else mounted on the walls at the same height as the smoke detector— the electrical box that housed the smoke detector, a thermostat, a wooden doorbell cover, and a picture frame — had sustained serious heat damage or had melted completely. Testing indicated that the smoke detector would have worked properly if it had been on the wall at the time of the fire.
James Edwards, a deputy with the State Fire Marshal’s Office, testified that he interviewed Scott at the Russellville Fire Department on August 26. Scott gave the following account of the events of August 16:
“I went back to watch TV. I was watching Fear on HBO. I went back to check on them at 10:00 p.m. Mason was asleep and Noah Riley was not. I turned on the satellite and told him that he needed to go to sleep. I went back to watch my movie. The movie went off around 11:00 p.m. I went'in the room to check on the boys. The TV was off and Noah Riley was still awake. I told him to come get in the bed with me.
“We went to my room and went to bed. As I went to sleep, the house was fine. The Jack and Jill bathroom light was on and the night-light played and— plugged into the wall. In my room I had turned the light on over the toilet for Noah Riley. We went to sleep.
“The next thing I remember is something hitting my face. As I started to wake up, I could smell the smoke and feel the heat on my face. I rolled off the bed and covered Noah Riley and told him to be still. I crawled over to the door. I looked out in the hallway, which was covered in smoke. I could see flickering that I thought at the time was coming from the laundry room.
“I went back into our room, pushed the door to. I crawled back over to the bed and pulled Noah Riley off in the floor. He began to cry at this point. I took a deep breath, stood up, and opened the window. I punched the screen out. I picked up Noah Riley, kissed him, told him I loved him, and dropped him out of the window.
*406 “At this time I could hear crackling and popping. I began to try to get out of the window, got halfway out and fell. When I got on the ground, I took, Noah Riley by the hand and started around the house. He told me that I was hurting him. So I picked him up and carried him through the front yard with me.
“Where there was — there was fire coming out of the window in the boys’ room and going over the top of the roof. It was orange. I ran to Jennifer’s house, banged on the door. When she came to the door, I handed Noah Riley to her, told her to dial 911 that the house was on fire.
“I yelled to her that Mason was still in the house as I headed back to the house. I ran over to the garage doors. I put in the code and the doors would not open. I tried several times to get in with the code. Then I ran around to the front of the house. The flames had started running across the peak of the roof.
“I was headed to the front door when Brian [Copeland] grabbed me and held me down. Later I remembered the light in my bathroom was off when I woke up.”
(R. 1762-64.)
A psychiatrist, Dr. Rebecca Dailey, testified that Mason was brought to her for an evaluation in April 2007. She diagnosed Mason with Attention Deficit Hyperactivity Disorder (“ADHD”); Oppositional Defiant Disorder (“ODD”); and Pervasive Developmental Disorder (“PDD”). She prescribed Abilify for his obsessive behavior; Risperdal as a anti-psychotic; and Vyvense for his hyperactivity. Dr. Dailey testified that she last saw Mason 12 days before his death.
A pediatrician, Dr. Duane Carter, testified that on February 6, 2008, he diagnosed Mason with bronchitis and prescribed an antibiotic Omniced, a steroid drug Decadron, and a codeine based cough syrup whose generic name is prometha-zine. He prescribed promethazine again on April 16, 2008. Dr. Carter testified that the cough syrup would make a child sleepy.
A toxicologist at the Department of Forensic Sciences, Dr. Jack R. Kalin, analyzed Mason’s blood. Dr. Kalin testified that he identified the following drugs in Mason’s system: amphetamines, codeine, and promethazine, an antihistamine typically used to treat nausea in postoperative patients. He said that the amphetamine level in a typical child being treated for ADHD is less than 100 but that Mason’s level was 450 — a level, he said, that was consistent with what you would expect to see in a DUI case. Dr. Kalin further testified that this was the first case where he had seen codeine used in conjunction with promethazine and that both substances would induce sleepiness and drowsiness. Dr. Kalin said that he did not find the presence of Risperdal or Abilify in Mason’s blood. Mason’s carbon-monoxide level, he said, was greater than 90%, which is extremely high.
The State’s experts ruled out lightning, spontaneous combustion, rechargeable batteries, and faulty electrical wiring as the cause of the fire. Michael Haynes with the State Fire Marshal’s Office testified that there was no indication that any hydrocarbon accelerant had been used. (R.1927.) Dr. Raphael A. Franco, Jr., an electrical engineer, testified that he was asked to examine the scene and to determine whether the fire was electrical in origin. In August 2008, he said, he went to the scene and stayed there for 12 hours conducting his examination. Dr. Franco testified that there were five electrical outlets in the boys’s bedroom, that the wiring ran under the floor, that the outlets were all on one circuit breaker, that he inspect *407 ed every outlet and receptacle, except outlet number 1, that he took 425 photographs of the scene, that he examined the wiring underneath the house, that he examined the attic, that the night-light was not the cause of the fire, that there was no damage to the underground wiring in the house, that the fire did not originate in outlet number 1 because the electrical box that housed the outlet was intact, and that, in his opinion, the fire was not electrical in origin. He further testified that the television had been plugged into outlet number 5, that the cord to the television was damaged by an external fire which caused the circuit breaker to trip meaning, he said, that the electricity had to pass through outlets number 1 through 4 before going to 5 and that the fire could not have been electrical in origin.
A fire-protection consultant, James Munger, testified for the State as an expert in the area of fire science. Munger said that he visited the scene of the fire and reviewed hundreds of photographs that had been taken of the damage. The following occurred during his direct examination:
“[Prosecutor]: [D]id you form an opinion as to whether all accidental nonin-tentional causes of the fire had been eliminated?
“[Munger]: Yes, sir. I mean, obviously, one of them was the electrical. I was aware of Dr. Franco’s work. But I was also, even though they had been there before I was, I was still able to look at where all of the electrical receptacles ' were located, and you can very clearly tell from the burn or lack of burn damage around all of those receptacle locations that the fire did not originate from any of those.”
(R. 2651.) It was his opinion that the fire was incendiary, which he explained, is a fire “intentionally set by someone.... ” (R. 2654.) Phillip Freeman, a deputy State fire marshal, testified that it was his opinion that the fire originated around the bed that was closest to the window — Noah’s bed. (R. 1891.) He said the following concerning the outlets:
“The plugs appeared to have external damage. All the damage that I observed appeared to come from external heat. When you looked at the actual— where the wires were attached to the outlets in the box, the insulation was still in pretty good shape on them.
“A couple of them even had the paper that is inside. When you strip the outer insulation back that paper in there, a couple of those even still had the paper in there. And if it had been interior heating from inside the box that should have — the insulation and that should have been a lot more damaged than what it showed.”
(R. 1895.) Freeman testified that the outlet the television was plugged into had the “least damage of any of them in the room.” (R. 1896.) It was his opinion that the fire was not electrical in origin. Mason’s high level of carbon monoxide did not change his opinion, he said: “I feel like that, as I explained, the way the fire built up and ventilated out of that hallway that it probably burned slow early on for .several minutes and that allowed [Mason] to breathe a large amount of this carbon monoxide before the room actually built up enough to get flashover, if, indeed, it did.” (R.1922.)
The State presented numerous witnesses who testified concerning Scott’s behavior immediately after the fire, which was inconsistent with a grieving parent. Anna Kay Greenhill, a hair stylist at Hello Gorgeous, testified that on the day of Mason’s death, Christie and Jeremy came to the shop for Jeremy’s scheduled appointment. She said that they joked and bantered about how long Jeremy’s hair had *408 gotten but did not mention Mason’s name at any time during the 20-minute appointment. Heather McCalpin, who was married to one of Scott’s cousins, testified that at the funeral Scott held her daughter and said: “Noah’s always wanted a baby sister, maybe he can get one now.” (R. 2982.)
Witnesses testified that Scott had been cruel to Mason in public, the last time being on the morning of the fire when Scott took Mason to school where she spoke harshly to him and pushed him. Other witnesses testified that Scott had verbally abused Mason and that she had yanked his hair, shoved him, and hit him on the back of the head to make him be quiet. Another witness testified that after the fire, Scott told him she did not know how she could be so unlucky — that she had had three house fires in two years and that God was punishing her for not wanting to raise Mason, an autistic child.
The evidence also showed that Scott had obtained two life-insurance policies on Mason and Noah within months before Mason’s death and on August 15, 2008, had applied for a third life-insurance policy. Robert Robinson, a senior vice president for Alfa Insurance, testified that Alfa had two life-insurance policies on Mason Scott. The first policy, issued on May 6, 2008, was for $50,000; a second policy issued on June 14, 2008, was for $25,000. The Scotts had the same coverage for Noah. Jeremy and Christie Scott were the beneficiaries of the policies, Robinson said. A check from Alfa had been issued to the Scotts for $25,000 after Mason’s death, but Alfa declined to pay the remaining amount because Scott had omitted information concerning Mason’s health and his medications on the application for the $50,000 policy. Lee Janacek, director of claims for the Woodmen of the World Insurance Company, testified that on August 16, 2008, Scott obtained a third life-insurance policy on Mason in the amount of $100,000. He further testified that Scott failed to indicate in her policy application that Mason had health problems or that medication had been prescribed for his condition. David Swindall, a claims supervisor with Farmer’s Insurance, testified that after the August 2008 fire his company settled with the Scotts on their homeowner’s policy and paid them $188,000 for the dwelling, $60,000 for its contents, and $5,500 for living expenses. (R. 2374.)
Russell Yawn, chief investigator for the Office of Prosecution Services, testified that he supervised the forensic examination conducted on the computer taken from the Scott residence. He examined the Internet' search history for August 15 and August 16, 2008. On August 15, he said, the computer was used to search numerous real-estate sites for houses for sale. Also, at 1:04 a.m. on the morning of August 16, 2008, the computer showed that a user accessed the site boaterexam.com. There was also testimony that the day before the fire Scott had asked a teacher if her house was for sale.
Evidence was also presented indicating that two fires had occurred at the Scotts’ previous residence on Steel Frame Road in 2006 and that as a result of the second fire the Scotts had received over $185,000 in insurance monies. The following testimony was presented concerning these two fires:
A real-estate broker, Willodean Davis testified that in May 2005 her company, Davis Realty and Associates, listed the Scott house on Steel Frame Road for sale. Davis testified that the house did not sell in the six-month listing period and that the Scotts did not relist the house. Kirk Ber-ryman, a former agent with Farm Bureau Insurance, testified that in February 2005 he sold the Scotts insurance for their home on Steel Frame Road in the amount of *409 $116,000. In December 2005, he said, the Scotts increased the coverage to $139,-000 — the maximum amount it could be increased without a new appraisal. A ring, valued at $14,750, was added to the insurance policy in November 2005.
On January 12, 2006, the first fire occurred at the Scott residence on Steel Frame Road. This fire was ruled an accident. It started when a pizza box was left on top of a hot burner. Little damage was done to the house and few repairs were necessary. The second fire, which occurred on January 14, 2006, started in the kitchen and destroyed the Scott’s house. Dwight Walden, a fire investigator, testified that, in his opinion, the second fire was intentionally set. There was also evidence that Scott was the last individual to leave the house before that fire, that Scott had increased her insurance coverage three months before that fire, and that the smoke alarm had been disconnected when the house was being cleaned. As a result of the second fire the Scotts received insurance monies of over $185,000.
In her defense, Scott presented the testimony of two experts in fire investigation and numerous friends and family members. The experts testified that the August 16, 2008, fire was accidental and started in the enclosed wooden television cabinet in the children’s bedroom. Defense experts testified that the State’s experts had based their arson determination on outdated methods, that the State investigation had numerous flaws, and that the State’s experts erred in concluding that the fire originated near Noah’s bed. It was their opinion that the fire was a closed-cabinet fire because of the high level of carbon monoxide in Mason’s blood.
Scott testified in her own defense and said that at approximately 11:00 p.m. on August 15 she turned off her television and went to check on her sons. Noah was still up and she had him come to bed with her. At approximately 2:30 a.m., she said, she was awakened when Noah slapped her on the face. She smelled smoke and tried to get to Mason’s bedroom but was unable to do so because of the thick smoke and intense heat. Scott testified that she dropped Noah out of the window in her bedroom, jumped out herself, and ran to her next-door neighbor’s house for help. She said that she returned with her neighbor and tried to get back into the house:
“I pushed the code in, it wouldn’t— and my hands were jerking, and I thought it may be me that my hands were jerking so bad that I was hitting the wrong buttons. So I told Brian [Copeland] the code, and Brian pushed in the code and it wouldn’t open.”
(R. 3667.) She said that she tried to put in the code six times. Scott also testified that she gave Mason a teaspoon of cough medicine the evening before the fire because he was coughing. A good portion of Scott’s testimony was inconsistent with the testimony of numerous State witnesses.
Scott’s father, Donald Bray, testified that he did not ask Scott what she had done when he arrived at the scene but that he asked where his babies where.
In rebuttal, the State presented the testimony of Jim Hananah with the. State Fire Marshal’s Office. He testified that Jeremy Scott initially cooperated with police and told them that Scott said to him at Mason’s graveside, “What do you' think about having another child now?” (R. 3863.)
Kelly Bragwell testified that she was related to Scott’s husband by marriage. She said that she retrieved some jewelry out of Scott’s home about one week after the fire. Bragwell further testified that Scott told her that her “nice wedding ring” *410 was not in the house at the time of the fire but was at her mother’s house.
The jury chose riot to believe Scott’s account of the events of August 16, 2008, and convicted Scott of three counts of capital murder. A separate sentencing hearing was held. Scott presented the testimony of more than 20 family members, friends, and clergy members. The jury recommended, by a vote of 7 to 5, that Scott be sentenced to life imprisonment without the possibility of parole. The circuit court held a separate sentencing hearing, declined to follow the jury’s recommendation, and sentenced Scott to death. The court found two aggravating circumstances: that Scott murdered her son Mason for pecuniary gain and that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. The circuit court found one statutory mitigating circumstance — that Scott had no significant history of prior criminal activity. The court also found as nonstatu-tory mitigating circumstances: that Scott was loved, that Scott’s death would have an impact on her surviving son, that Scott had helped people throughout her life, and that the jury had recommended a sentence of life imprisonment without the possibility of parole. After weighing all these circumstances, the circuit court sentenced Scott to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala.Code 1975.

Standard of Review

Because Scott has been sentenced to death, this Court applies the standard of review set out in Rule 45A, Ala. R.App. P., which states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In discussing the scope of “plain error,” the Alabama Supreme Court has stated: <
“ ‘ “ ‘Plain error’ arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’ ” Ex parte Womack, 435 So.2d 766, 769 (Ala.1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)). See also Ex parte Woodall, 730 So.2d 652 (Ala.1998). ‘ “In other words, the plain-error exception to the contemporaneous objection rule is to be ‘used sparingly, solely, in those circumstances in which a miscarriage of justice would otherwise result.’ ” ’ Ex parte Land, 678 So.2d 224, 232 (Ala.1996) (quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982))). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court may take appropriate action when the error ‘has or probably has adversely affected the substantial rights of the appellant.’ Rule 45A, Ala. R.App. P. ‘[A] failure to object at trial, while not precluding our review, will weigh against any claim of prejudice.’ Ex parte Woodall, 730 So.2d at 657 (citing Kuenzel v. State, 577 So.2d 474 (Ala. *411 Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991)).”
Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002). “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999).
With these principles in mind, we review the issues raised by Scott in her brief to this Court.
I.
Scott argues that the circuit court erred in denying her motion for a change of venue because, she says, the community was so saturated with prejudicial pretrial publicity that she was prevented from obtaining a fair and impartial trial.
The record shows that in March 2009 Scott moved for a change of venue and argued the following:
“All the major newspapers in the area of Franklin County, Lauderdale County, Limestone County, Madison County, Alabama, and other surrounding counties have published and circulated newspaper articles describing the acts with which [Scott] is charged, and these papers included significant portions of documentary and hearsay evidence relative to [Scott], the admissibility of which has not been considered by this Honorable Court. This information has severely prejudiced defendant.”
(C. 258.) In April 2009, Scott filed a second motion for a change of venue and submitted the results of a telephone survey of Franklin County that had been conducted within the preceding three months. The survey showed that 80% of the people polled had heard about the case and that 64% thought that Scott should be punished. After a hearing, the circuit court denied the motion for a change of venue. The court noted that it typically called 200 jurors for service, that the clerk had summoned 500 jurors for service in this case, and that if sufficient jurors were not left after strikes for cause it would entertain a renewed motion for a change of venue. (C. 358.)
During voir dire, after Scott read the juror questionnaires, Scott renewed her motion for a change of venue. The circuit court denied the motion and indicated that it would see what happened during the voir dire examination; (C. 408.) It does not appear that Scott renewed this motion after voir dire examination.
“In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice' against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).
“The ‘actual prejudice’ standard is defined as follows:
“‘To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] *412 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and “render[ed] a verdict based on the evidence presented in court.” Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].’
“Coleman v. Zant, 708 F.2d at 544.
' “... [The defendant] relies on the ‘presumed prejudice’ standard announced in Rideau v. Louisiana, 373 U.S. 723 (1963)], and applied by the United States Supreme Court in Estes and Sheppard. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: ‘Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.’ 778 F.2d at 1490 (emphasis added). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“In determining whether the ‘presumed prejudice’ standard exists the trial court should look at ‘the totality of the surrounding facts.’ Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely’ applicable, and is reserved for only ‘extreme situations.’ Coleman v. Kemp, 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.’ Coleman v. Kemp, 778 F.2d at 1490.”
Hunt v. State, 642 So.2d 999, 1042-44 (Ala.Crim.App.1993).
“The burden of showing actual prejudice or community saturation with prejudicial publicity lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333 (1966). In addition, the appropriate method to establish the existence of adverse publicity or actual prejudice is through voir dire examination of potential jurors. Anderson v. State, 362 So.2d 1296 (Ala.Cr.App.1978); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865 (1985).”
Hart v. State, 612 So.2d 520, 527 (Ala.Crim.App.1992).
“[T]he determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.”
Nelson v. State, 440 So.2d 1130, 1132 (Ala.Crim.App.1983).
Gur examination of the juror questionnaires shows that of. the 82 jurors who completed questionnaires, 56 of those jurors indicated that Scott was not guilty, 12 indicated that Scott was guilty, 11 had no opinion, 2 left the question blank, and 1 juror answered “n/y.”[1] All 82 jurors indicated that they had not been exposed to anything about the case that would make it *413 difficult for them to sit on the jury. Sixteen jurors were questioned concerning their responses on the questionnaire to the questions concerning Scott’s guilt. One of these jurors was struck for cause. Those jurors who indicated that they thought Scott was guilty said during voir dire examination that they either did not understand the question or the court system and that they could follow the court’s instructions.
The record clearly shows that the venire was not biased based on any pretrial publicity. Accordingly, the circuit court did not abuse its discretion in denying Scott’s motions for a change of venue. See Hunt, supra.
II.
Scott next argues that the circuit court erred in failing to remove for cause five veniremembers who, she says, had relationships or beliefs that impaired their ability to be impartial and forced her to use her peremptory challenges to remove these jurors.
“To justify a challenge for cause, there must be a proper statutory ground or ‘“some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.” ’ Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992) (quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App.1983)). This Court has held that ‘once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions’ about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror ‘need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has. formed some opinions regarding it.’ Kinder v. State, 515 So.2d 55, 61 (Ala.Cr.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror ‘ “must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused” ’; ‘ “[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render.” ’ Oryang v. State, 642 So.2d 979, 987 (Ala.Cr.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Cr.App.1989)).”
Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998).
“A trial judge is in a decidedly better position than an appellate court to assess the credibility of the. jurors during voir dire questioning. See Ford v. State, 628 So.2d 1068 (Ala.Crim.App.1993). For that reason, we give great deference to a trial judge’s ruling on challenges for cause. Baker v. State, 906 So.2d 210 (Ala.Crim.App.2001).”
Turner v. State, 924 So.2d 737, 754 (Ala.Crim.App.2002).
Section 12-16-150(7), Ala.Code 1975, states that a juror should be removed for cause if “he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.”
A.
Scott first argues that the circuit court erred in denying her motion to remove juror KB. for cause because, she argues, K.B. is the sister of Russellville *414 Fire Cpt. Steve Thornton who was a critical state witness: he testified, in depth, concerning the investigations into the 2006 and the 2008 fires at the Scotts’ houses and was the evidence custodian. Scott relies on Ex parte Tucker, 454 So.2d 552 (Ala.1984), and Simpson v. State, 666 So.2d 100 (Ala.Crim.App.1995), to support her argument.
The record shows that after voir dire of K.B., defense counsel made the following motion:
“[A]lthough [K.B.] continuously said that the fact that her brother is a witness in this trial that that would not affect her ability to be fair, it’s our position and caselaw supports our position that the jurors themselves are sometimes ill-postured to make a determination as to whether or not they can be fair.
“And because of that familial relationship with a brother that’s actually one of the key witnesses in the prosecution of this case, we feel this is one of those situations where her challenge for cause is warranted in spite of her answers. And it’s because of the familial association and the fact that her own brother is one of the key witnesses in the case.
“Even though she says she can be fair, I think that reason suggests otherwise.”
(R. 860-61.) The circuit court denied the motion based on KB.’s answers to voir dire questions. (R. 861.)
The Alabama Supreme Court in Ex parte Tucker, reversing Tucker’s conviction on an unrelated claim, stated:
“[W]e note that during the qualification of the venire, it was discovered that a potential venireman, Jerry Bradshaw, was the brother of a witness for the State. Counsel for petitioner challenged the venireman for cause, stating, ‘He is the brother of perhaps the most material witness in the entire case.’ The trial judge denied the challenge. To do so was reversible error. Nobis v. State, 401 So.2d 191 (Ala.Crim.App.), cert. denied, 401 So.2d 204 (Ala.1981).”
454 So.2d at 553.
In Simpson v. State, 666 So.2d 100 (Ala.Crim.App.1995), this Court relied on the Supreme Court’s decision in Tucker and reversed Simpson’s murder conviction after the circuit court failed to exclude a juror for cause whose son-in-law was the chief investigator on Simpson’s murder case.
Based on the Supreme Court’s decision in Tucker and this Court’s decision in Simpson, we must hold that the circuit court erred in refusing to remove juror K.B. for cause based on her relationship to a critical state witness. However, the inquiry does not end there. Scott was forced to use one of her peremptory strikes to remove K.B. As the Alabama Supreme Court stated in Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002):
“The application of a ‘harmless-error’ analysis to a trial court’s refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
“‘The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges.’
*415 “Turner v. State, 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that ‘[t]he denial or impairment of the right is reversible error without a showing' of prejudice.’ (Emphasis added [in Bethea].) Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See Dixon v. Hardey, 591 So.2d 3 (Ala.1991); Knop v. McCain, 561 So.2d 229 (Ala.1989); Ex parte Rutledge, 523 So.2d 1118 (Ala.1988); Ex parte Beam, 512 So.2d 723 (Ala.1987); Uptain v. State, 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting Swain and citing Beam and Rutledge); Mason v. State 536 So.2d 127, 129 (Ala.Crim.App.1988) (quoting Uptain).
“... [T]his Court has returned to the ‘harmless:error’ analysis articulated in the Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and [United States v.] Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an ‘impartial’ jury, see Ala. Const. 1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
“In this instance, even if the Betheas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.”
833 So.2d at 6-7.
Later, in General Motors Corp. v. Jernigan, 883 So.2d 646 (Ala.2003), the Supreme Court revisited its holding in Bethea and found reversible error in the trial court’s failure to remove five, prospective jurors for cause. The Court stated:
“Because Ross [v. Oklahoma, 487 U.S. 81 (1988)], [United States v.] Martinez-Salazar, [528 U.S. 304 (2000),] Bethea [v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002),] and Turner [v. State, 160 Ala. 55, 49 So. 304 (1909)] all involved only one juror, those cases can be distinguished. GM was forced to use 5 of its 19 peremptory challenges, over 25%, to eliminate potential jurors who should have been struck by the trial court pursuant to GM’s challenges for cause.. The jury that was seated consisted of jurors who had been clients of one of the law firms representing Jernigan, who knew Jernigan and/or his witnesses, and who had either been injured themselves in automobile accidents or who had relatives who had been injured, two of whom had filed lawsuits as a result. Presumably, such jurors would have been struck by GM through the exercise of its peremptory challenges had the full arsenal 'of such challenges been available against jurors who remained after correct rulings on the challenges for cause. The fact .that GM left one of Myron Penn’s relatives on the jury, albeit as an alternate, demonstrates that it could not exercise enough peremptory challenges to remove all of the veniremembers it had challenged for cause.
“Based upon the unique facts and circumstances here presented, the trial court, by denying five of GM’s chai- *416 lenges for cause that should have been granted, substantially impaired GM’s right to the use of its peremptory challenges in selecting a jury. In this case, unlike Bethea, the jurors who ultimately were selected fell in the category of jurors who would likely have been the subject of peremptory challenges had such challenges been available. Therefore, we conclude that the multiple errors on the part of the trial court in improperly denying GM’s challenges for cause were not harmless, whether or not it could have been shown that the jury ultimately seated was unbiased and impartial.
“The trial court erred in denying GM’s challenges for cause as to the five veniremembers related to attorneys in this case.”
883 So.2d at 672-73. See also Ex parte Colby, 41 So.3d 1 (Ala.2009) (finding reversible error in court’s failure to remove three prospective jurors for cause).
Because we hold that there was no error in regard to the remaining challenged jurors, we hold that any error in failing to grant Scott’s challenge for cause of juror K.B. was harmless. See Bethea, supra.
B.
Scott argues that the circuit court erred in denying her motion to remove juror L.H. for cause because, she says, L.H. said during voir dire that she had discussed the case with her husband, that she knew Scott’s family, and that she was a “tenderhearted” person.
The following occurred during the voir dire of juror L.H.:
“[Defense counsel]: And are you telling us that you don’t think you would be able to sit and hear this case?
“[L.H.]: Probably not.
“[Defense counsel]: Okay.
“[L.H.]: I mean, without crying and carrying on. I mean, that’s just the truth.
“[Defense counsel]: Well, that’s what we want to hear.
“[L.H.]: Because I’m just real tender hearted.
“[Defense counsel]: But the question would be — and I understand you said it may be emotional, but can you follow the instructions, follow the law or would it be impossible to do that because of your emotions?
“[L.H.]: No, I could. But I haven’t slept the last two nights worrying about it. I woke up at 2:00 and 2:30, and I was just — it’s just too close to kids.
“The Court: All right. I interrupted you. Did you have anything?
“[Defense counsel]: I don’t have anything else, Your Honor.
“The Court: Okay. [Prosecutor], anything?
“[Prosecutor]: As the judge said, you could follow the law—
“[L.H.]: Oh, yes.
“[Prosecutor]: — and apply the law to the facts as you see them?
“[L.H.]: Right. Right.”
(R. 794-96.) Scott moved that juror L.H. be removed for cause, and the following occurred:
“The Court: That would be denied. I think she said she could follow the law. She doesn’t want to serve, but I don’t think that’s a legally justifiable excuse to let her out of service.
“[Defense counsel]: Judge, she’s one of the teachers that commented yesterday that all teachers should be excluded from the jury because of their close work with children and the fact that a child is involved in this case.
“The Court: Yes, I do remember that, but she said that she, personally, could *417 follow the judge’s instructions. So that would be denied.”
(R. 862.)
“Because the qualification of a juror is a matter within the discretion of the trial judge, on appeal this Court will look to the questions asked and the answers given only to see if the trial court’s discretion was properly exercised.” Ex parte Cochran, 500 So.2d 1179, 1183 (Ala.1985). “ ‘[T]he mere fact that a prospective juror is personally acquainted with the victim [or his family] does not automatically disqualify a person from sitting on a criminal jury.’ ” Morrison v. State, 601 So.2d 165, 168 (Ala.Crim.App.1992), quoting Brownlee v. State, 545 So.2d 151, 164 (Ala.Crim.App.1988).
“The test for determining whether a strike rises to the level of a challenge for cause is ‘whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.’ Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). ‘Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.’ Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). ‘The decision of the trial court “on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.” ’ Nettles, 435 So.2d at 153.”
Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).
Clearly, juror L.H. indicated that she was impartial, that she could follow the law, and that she could apply the law to the facts of the case. The circuit court committed no error in denying Scott’s motion to remove juror L.H. for cause. See Dunning.
C.
Scott next argues that the circuit court erred in denying her motion to remove juror A.K. for cause because A.K.’s daughter worked at the hair salon used by the Scott family, because A.K. has a special-needs grandchild that would make it difficult for her to serve on the jury, and because A.K. had talked to her daughter about the case.
The record shows that juror A.K. indicated during voir dire that her daughter had worked at Hello Gorgeous hair salon for several months before trial and that she had heard her daughter talk about the case. The following then occurred:
“[Prosecutor]: Okay. Could you still sit on this jury and make a decision in the case based on the evidence in the case?
“[A.K.]: Yes.
“[Prosecutor]: And not be swayed by what you may have heard one way or the other?
“[A.K.]: Yes.”
(R. 481-82.) Scott moved that juror A.K. be removed for cause without stating any basis for the motion. The circuit court denied the motion. (R. 864.)
Scott asserts that because the record showed “probable prejudice” in regard to juror A.K., the circuit court erred in denying her motion to remove A.K. for cause. In regard to probable prejudice, we have stated:
“In the event that probable prejudice is demonstrated, the trial court should determine whether the challenged juror can set aside that prejudice and render a verdict solely on the evidence. See Dailey [v. State ], 828 So.2d [340] 343 [(Ala.2001)] (‘ “ ‘[I]f the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court,’ he is not subject to challenge for cause.” ’ (quoting Minshew *418 v. State, 542 So.2d [307] at 309 [(Ala.Crim.App.1988)], quoting in turn Mahan v. State, 508 So.2d 1180, 1182 (Ala.Crim.App.1986))). . . . ”
Ex parte Colby, 41 So.3d 1, 5 (Ala.2009).
A.K. stated that she could sit on the case and make a decision based on the evidence and that she would not be swayed by what she had heard. A.K. also did not ask to be excused from service because of her grandchild. She merely stated that arrangements would have to be made. According to Colby, A.K. was not subject to a challenge for cause. Thus, the court committed no error in denying Scott’s motion to strike A.K. for cause.
D.
Scott asserts that juror C.M. should be removed for cause based on his responses to questions concerning the appropriateness of the sentence.
The following occurred during voir dire questioning:
“[Prosecutor]: [Y]ou said that if there is a murder or a death, there should always be the death penalty. Is that not what you said? Did I get you wrong?
“[C.M.]: I didn’t mean it like that if I did. .
“[Prosecutor]: But my point is, if it comes to that point in the trial, you could sit here and you could make a decision and listen to both sides and seriously consider the death penalty along with the other choice that you might have in the case?
“[C.M.]: (Nods head up and down.)
“[Prosecutor]: Okay. If you will, speak up so he can take it down.
“[C.M.]: Yes, sir.”
(R. 473.) Later during voir dire, defense counsel questioned C.M. and the following occurred:
“[Defense counsel]; Okay. You were also asked some questions about the death penalty.
“[C.M.]: Uh-huh.
“[Defense counsel]: Can you tell us what your views are about the death penalty, sir? And keep in mind, there aren’t any right or wrong answers here. We just want to hear how you feel.
“[C.M.]: Well, I think there’s things that’s done should get the death penalty.
“[Defense counsel]: Okay.
“[C.M.]: Certain crimes just make me sick, you know.
“[Defense counsel]: What about a situation where someone intentionally kills another individual? Do you believe the death penalty should be imposed in some of those kind of cases every time?
“[C.M.]: Well, maybe not every time because sometimes, you know, life without parole is just about as bad as death.
“The Court: Okay. What about a situation where someone intentionally kills child? What do you think about that? Was that appropriate for the death penalty every time?
“[C.M.]: I would have to give them the death. Yep, I would have to give them the death [penalty] for killing a child.
“[Defense counsel]: Are you pretty set in that opinion?
“[C.M.]: Well, yeah. Pretty set in it. I feel that I don’t like people messing with kids.
[[Image here]]
“[Prosecutor]: What I want to do is ask you just a little bit about your views on the death penalty. And I know you have those views and I know you said they were pretty set as far as some types of death.
“Do you understand that under the law there are certain intentional killings under the law where the death penalty *419 isn’t even an option and that the Legislature has set out certain types of murder where they have said that the death-penalty is an option?
“And my question to you is, after we talked today, and I know what your feelings are, but after we talked today, assuming that this defendant is found guilty of capital murder, could you sit on this jury and listen to the judge’s instructions and despite your feelings, could you weigh those aggravating circumstances we talked about and the mitigating circumstances and in this case where there was the death of a child come up with a decision, possibly after weighing those, come up with a decision of life without parole?
“[C.M.]: Yes, I could. I’m open to it.
“[Prosecutor]: Okay.
“[C.M.]: I hate people killing kids.
“[Prosecutor]: Well, I understand that. But you could, you could do that and you could follow the Court’s instructions about that?
“[C.M.]: Yes.
“[Prosecutor]: Okay.
“The Court: [C.M.] the law would say that there are certain times that even the killing of a child does not warrant the death penalty depending upon aggravating and mitigating circumstances. You would have to put aside your personal opinion that the murder of a child should always require the death penalty.
“Can you do that or is that too deeply held a belief for you to put that aside?
“[C.M.]: I could do that.
“The Court: You could set it aside?
“[C.M.]: Yeah, set it aside.
“The Court: Okay. Because you would be asked and have a responsibility to weigh the mitigating and aggravating circumstances if guilt was proven beyond a reasonable doubt, and you couldn’t come in with the idea that you’re always going to give the death penalty to someone that killed a child. Can you do that?
“[C.M.]: I can do that.”
(R. 815-18.) Scott moved that juror C.M. be removed for cause without stating any grounds. The circuit court denied the motion. (R. 864.)
“ ‘[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the court.’ Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App.2000). ‘The crucial inquiry is whether the veniremen could follow the court’s instructions and obey his oath, notwithstanding his views on capital punishment.’ McNabb v. State, 887 So.2d 929, 944 (Ala.Crim.App.2001), quoting other cases.”
Brownfield v. State, 44 So.3d 1, 34 (Ala.Crim.App.2007).
Though C.M. initially indicated that he thought a person who killed a child should be given the death penalty, upon further questioning C.M. indicated that he could follow the law and consider the mitigating evidence. C.M. was rehabilitated. Thus, the circuit court did not abuse its discretion in denying Scott’s motion to strike C.M. for cause.
E.
Scott next asserts that the circuit court should have removed juror S.S. for cause based on her views toward the death penalty and because she knew State witness Brian Copeland.'
' The record shows that on S.S.’s juror questionnaire she indicated the following in response to the question about her feelings concerning the death penalty: “That people guilty of murder deserve the death penalty.” In response to the question *420 about the appropriateness of the death penalty for a person who intentionally kills another person, she cheeked the line indicating: “The death penalty should or should not be used depending on the facts of the case.” In answer to the question whether she agreed with the statement: “Anyone who plans and commits the crime of murder should get the death penalty,” she checked the line indicating that she “[a]greed somewhat.”
During voir dire of S.S., the following occurred:
“[Prosecutor]: Could you ... if it comes to this point in the trial, sit on the jury venire and during the sentencing phase and listen to the mitigating circumstances and the aggravating circumstances and fairly consider all of the options you have?
“[S.S.]: Yes sir.
“[Prosecutor]: You could do that?
“[S.S.]: Yes, sir.”
(R. 473-74.) Later, the following occurred:
“The Court: The fact that Mr. Copeland may be a witness in the case, do you feel like that would affect your ability to be fair and impartial?
“[S.S.]: The only reason I’m saying that is I have had discussions with his family as to what he may or may not know. And I don’t — as the person I know him to be, I know him to be fair. .And for what (inaudible) I’ve heard so much.
“The Court: So that—
[[Image here]]
“All right. So based on that preexisting information that you have, then you think that it may affect your ability to be fair and impartial?
“[S.S.]: I would be fair, but I think I know — I mean, I just feel that I know too much or I’ve heard too much.
“The Court: You couldn’t put that knowledge out of your mind and go solely on what the evidence from the witness stand is?
“[S.S.]: I would listen to everything. I just want y’all to know that I do know this man and his family.
“The Court: Okay. Well, the question that I have to have satisfied is whether the information that you already know regarding Mr. Copeland and any conversations you’ve had from his family would affect you in some way?
“[S.S.]: No, sir. I would still listen and be — and listen and go by the evidence.
“The Court: Okay.
“[S.S.]: I’m not saying I wouldn’t.”
(R. 540-41.)
“The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975).” Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985). “Even though a prospective juror admits to potential bias, if further voir dire examination reveals that the juror in question can and will base his decision on the evidence alone, then a trial judge’s refusal to grant a motion to strike for cause is not error.” Perryman v. State, 558 So.2d 972, 977 (Ala.Crim.App.1989). “If a juror knows a witness or witnesses but states that he can follow the trial judge’s instructions and can follow the law, that juror is not automatically subject to removal for cause.” State v. Campbell, 359 N.C. 644, 702, 617 S.E.2d 1, 36 (2005). Juror S.S. indicated that she could follow the law and the evidence. The circuit court did not err in denying Scott’s motion to remove juror S.S. for cause.
*421 III.
Scott next argues that the circuit court erred in denying her Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion because, she says, the prosecutor used two of his peremptory strikes to remove black prospective jurors without having or providing race-neutral reasons for removing those jurors. In Batson, the United States Supreme Court held that it was a violation of the Equal Protection Clause to strike a black prospective juror from a black defendant’s jury based solely on the juror’s race. This holding has been extended to protect white defendants from racial discrimination in jury selection, to prohibit gender-based discrimination, and to prohibit defense counsel from discriminating during jury selection. See Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The Alabama Supreme Court in White Consolidated Industries, Inc. v. American Liberty Insurance Co., 617 S.2d 657 (Ala.1993), further extended this holding to white prospective jurors.
Here, the record shows that at the conclusion of striking the jury Scott argued that the State had violated Batson when it struck jurors B.H. and M.W. because, she says, there was no meaningful voir dire conducted on those jurors. (R. 874.) The State asserted that no prima facie case of discrimination had been established; however, the State proceeded to give its reasons for striking jurors B.H. and M.W.
“Because the prosecutor gave his reasons for the strikes, we presume that a prima facie case of racial discrimination was established and we proceed to the second and third steps in the Batson inquiry — whether the prosecutor’s reasons for the strikes were race-neutral and whether they were pretextual.”
Clark v. State, 896 So.2d 584, 609 (Ala.Crim.App.2000).
The prosecutor stated that he struck juror B.H. for the following reasons:
“We’ve done a lot of research on the jury list and as far as juror [B.H.], there’s been several law enforcement people that have indicated to us that juror [B.H.] may have a close relationship with some individuals who, either family or friends, with some individuals who have a strong dislike toward the Russellville Police Department.
“And of course, that would be a big concern since the Russellville Police Department is front and center in this case. And that was the reason we struck her.”
(R. 875.)
The prosecutor stated the following concerning juror M.W.:
“[A]s far as juror [M.W.], once again it comes down to two things on him. Number one, he had a bumper sticker on the back of his vehicle that says ‘Nekromantix,’ which upon researching that on-line is a death metal group that has a lot of death imagery and other things, and it concerned us very much that he had a bumper sticker like that on a car when he was involved in a death penalty case.
“And, secondly, he wrote on his questionnaire he had no confidence in the Russellville Police Department, and we’ve made it a point to strike all the people that had no confidence in law enforcement.”
(R. 875-76.) Defense counsel again indicated that no meaningful voir dire of either juror had occurred and that these jurors were not questioned concerning their responses to questions on the juror question *422 naires. (R. 876.) The circuit court denied the Batson motion. (R. 877.)
The Alabama Supreme Court in Ex parte Thomas, 601 So.2d 56 (Ala.1992), held that the State has “ ‘the burden of articulating a clear, specific, and legitimate reason for the challenge that relates to the particular case to be tried and that is nondiscriminatory.’” 601 So.2d at 58, quoting Ex parte Bird, 594 So.2d 676, 679 (Ala.1991). The Thomas Court stated:
“The trial court cannot merely accept the specific reasons given by the prosecutor at face value. Ex parte Branch, 526 So.2d [609] at 624 [(Ala.1987)]. Rather, the court must consider whether the facially neutral explanations are contrived to avoid admitting acts of group discrimination. Id. ”
Ex parte Thomas, 601 So.2d at 58.
Several years later in Ex parte McNair, 653 So.2d 353 (Ala.1994), the Supreme Court limited its holding in Thomas and stated:
“McNair did not ask to see, and was not denied access to, the prosecutor’s notes that had been prepared by ... law enforcement officials. Given the substantial body of evidence in this case indicating that there was no discriminatory intent on the prosecutor’s part, we refuse to extend the holding in Thomas to require a prosecutor, 'in every case where a Batson objection has been made, to provide an evidentiary foundation for each peremptory strike used against a black member of the venire (e.g., testimony from victims, police officers, or any other individual who may have supplied information about a member of the venire that the prosecutor believes in good faith to be true). See Smith v. State, 590 So.2d 388 (Ala.Crim. App.1991), citing Ex parte Lynn, 543 So.2d 709 (Ala.1988), cert. denied, Lynn v. Alabama, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989).”
653 So.2d at 357.[2]
The voir dire examination shows that jurors B.H. and M.W. answered few questions. However, B.H. completed a 12-page questionnaire and was very candid with her responses on the questionnaire. B.H. answered that she only had “some” faith in- the Russellville Police Department, that her brother had been convicted of assault, and that she had a family member or friend who had been murdered. B.H.’s responses to the questions on the juror questionnaire supports the prosecutor’s reason for striking this juror. M.W.’s juror questionnaire shows that he wrote that he had a bumper sticker on his vehicle that read: “Caution I drive as bad as you do, Nekromantix.” The prosecutor stated that he had researched this and discovered that “Nekromantix” was a “death metal group that has a lot of death imagery.... ” (R. 875.) M.W. also responded that he had “no” confidence in the Russellville Police Department.
“ ‘When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court and will reverse a trial court’s decision only if the ruling is clearly erroneous.’ Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App. 2001). ‘A trial court is in a far better position than a reviewing court to rule on issues of credibility.’ Woods v. State, 789 So.2d 896, 915 (Ala.Crim.App.1999). ‘Great confidence is placed in our trial judges in the selection of juries. Because they deal on a daily basis with the attorneys in their respective counties, *423 they are better able to determine whether discriminatory patterns exist in the selection of juries.’ Parker v. State, 571 So.2d 381, 384 (Ala.Crim.App.1990).
“ ‘Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will “largely turn on evaluation of credibility” 476 U.S., at 98, n. 21. In the typical challenge inquiry, the decisive question will be whether counsel’s race-neutral explanation for a peremptory challenge should be believed. There will seldom' be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lie “peculiarly within a trial judge’s province.” Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), citing Patton v. Yount, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).’
“Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).”
Doster v. State, 72 So.3d 50, 73-74 (Ala.Crim.App.2010). “A hostile attitude toward law enforcement or dissatisfaction with the police has also been upheld as a sufficiently race-neutral explanation for the use of a peremptory challenge.” Stephens v. State, 580 So.2d 11, 19 (Ala.Crim.App.1990).
Moreover, “[A] venire member’s written answers to a juror questionnaire may provide a valid reason for a peremptory strike.” Grant v. State, 325 S.W.3d 655, 660 (Tex.Crim.App.2010).
“The Commonwealth can rely on a jury questionnaire to derive its race neutral reasons for striking a,juror. Commonwealth v. Snodgrass, Ky., 831 S.W.2d 176 (1992). An attitude of mistrust expressed on a juror questionnaire should be given the same weight as an attitude of mistrust or bias expressed by a juror on voir dire examination.”
Woodall v. Commonwealth, 63 S.W.3d 104, 120-21 (Ky.2001).
Affording the circuit court’s ruling the deference that it is due, we find no .abuse of discretion in the circuit court’s denial of Scott’s Batson motion.
IV.
Scott next argues that the circuit court encouraged, and in fact, had ex parte communications with the jurors.
The record shows that at the beginning of the voir dire process the court stated the following to the entire jury venire: “If we can accommodate you in any way, we will. Stop us in the hallway, ask us for something. If you have any special needs whatsoever whether it’s medical or anything, let us know. We will do anything we can to try to help in that process.” (R. 278.) Later, after prospective jurors were struck based on their failure to meet certain statutory qualifications, the circuit court stated:
“[A]s I told you earlier, I will accommodate you in any way, my staff will, Anita Scott will. We’re fair and impartial in this, we don’t have a vested interest one way or the other. So, yes, if you have a question, you can ask me, you can ask my staff or you can say hello to me in the hallway, and I can say hello to you.
“And it may be a question that we have to come in here and put on the record with everyone present, but you can ask that question. I would ask you. *424 not to talk to anyone at home about the case tonight.”
(R. 358.)
Scott specifically challenges three instances of what he asserts constituted ex parte communications between the judge and the jurors.
A.
Scott first asserts that the circuit court erred in excusing prospective juror D.T. after his wife informed the circuit judge’s office that her father was having emergency surgery. The record shows that at the beginning of voir dire after the court had played a videotape to the jury pool concerning jury service, the circuit court indicated for the record that it had excused juror D.T. because of a family emergency.
Section 12 — 16—63(b), Ala.Code 1975, provides:
“(b) A person who is not disqualified from jury service may apply to be excused from jury service by the court only upon a showing of undue or extreme physical or financial hardship, a mental or physical condition that incapacitates the person, or public necessity....”
In addressing the scope of § 12-16-63, Ala.Code 1975, this Court has stated:
“The trial court is vested with broad discretion in excusing potential jurors from service under this section. See Giles v. State, 632 So.2d 568, 574 (Ala.Cr.App.1992). Trial courts have properly excused jurors pursuant to this section for a myriad of reasons. See Madison v. State, 718 So.2d 90, 100 (Ala.Cr.App.1997) (potential juror excused because mother had recently undergone surgery and suffered with Alzheimer’s disease; another potential juror excused because juror’s mother was terminally ill); Allen v. State, 683 So.2d 38, 42 (Ala.Cr.App.1996) (eight potential jurors were excused, most of whom were students at the University of Alabama with pending final exams); Knotts v. State, 686 So.2d 431, 480 (Ala.Cr.App.1995) (veniremember excused by a ‘court strike’ because there was an odd number of veniremembers remaining); Giles v. State, supra, at 574 (black potential juror properly excused because she was sole caretaker of an infant and a five-year-old child). See also Gwin v. State, 425 So.2d 500, 504 (Ala.Cr.App.1982) (appellant’s claim that judge had arbitrarily excused potential jurors was without merit). Moreover, a trial court is not required to ask follow-up questions or to have potential jurors elaborate on any possible preventions of their hardships. See Madison v. State, supra, at 100.”
McWhorter v. State, 781 So.2d 257, 273 (Ala.Crim.App.1999).
“Section 12-16-74, Code of Alabama 1975, expressly provides that a trial court in capital cases may excuse prospective jurors outside the presence of parties and their counsel, for reasons of ‘undue hardship, extreme inconvenience, or public necessity,’ as provided in § 12-16-63(b).” Ex parte Pierce, 612 So.2d 516, 518 (Ala.1992).
The circuit court followed the law as set out in § 12-16-63, Ala.Code 1975; therefore, we find no error.
B.
Scott next argues that the circuit court erred in excusing prospective juror A.C. outside her presence. The record shows the following discussion:
“Before we argue any motions, let me just tell both sides, venireperson [A.C.], the circuit clerk brought her in because she had told her about her hardship with *425 school that she has classes Tuesdays and Thursdays and asked to be excused, and I went ahead and excused her during lunch.”
(R. 376.) The circuit court did not err in excusing A.C. outside Scott’s presence for hardship reasons under § 12-16-63, Ala.Code 1975.
C.
Scott further asserts that it was error for the court to have an ex parte discussion with juror J.M. The following occurred:
“The Court: [J.M.] just came to my office during the break and stated he knew facts from both sides and just does not feel like he can be fair and impartial and set aside that. I’ll let either attorney ask or either side ask questions.
[[Image here]]
“Let me just ask you, though, the reason that you do not feel that you can be fair and impartial to both sides is? “[J.M.]: Because I worked with the boy’s grandpa for a while, and I have, you know, been told what they found in the—what that boy burned in. So I don’t feel like I need to be on it.
“The Court: Okay. You don’t feel like you could set aside what you’ve heard and the fact you’ve worked—when you say ‘the boy’s grandpa,’ are you talking—
“[J.M.]: No. I don’t feel like—
“The Court: Are you talking about the deceased child’s grandpa?
“[J.M.]: Yeah. I don’t feel like I would be doing a fair deal.
“The Court: Either side? I’m going to excuse him based on the fact he tells me he can’t be fair and impartial based on what he knows. Does either side have questions for him?
“[Defense counsel]: No.
“[Prosecutor]: No.”
(R. 295-96.)
Both the prosecutor • and defense counsel indicated that they had no problems with the circuit court’s method of handling the issue. Thus, if any error occurred, it was invited by defense counsel’s actions. “ ‘ “Invited error has been applied to death penalty cases. ‘An invited error is waived, unless it rises to the level of plain error.’ Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991).” ’ ” Saunders v. State, 10 So.3d 53, 88 (Ala.Crim.App.2007), quoting Scott v. State, 937 So.2d 1065, 1075 (Ala.Crim.App.2005), quoting in turn Adams v. State, 955 So.2d 1037, 1050-51 (Ala.Crim.App.2003).
Moreover, “When an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communications to counsel for all parties.” Rushen v. Spain, 464 U.S. 114, 119, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). That is what the court did in this case. Scott had an opportunity to question J.M. and J.M. indicated that he was biased based on his knowledge of the case. Thus, we find no error in the circuit court’s actions in regard to juror J.M.
V.
Scott next argues that the circuit court erred in death-qualifying the jurors because, she says, it produced a conviction-prone jury that was more likely to vote for the death penalty.
We have repeatedly upheld the practice of death-qualifying prospective jurors in a capital-murder case.
‘“In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from “death qualification” of juries in capital cases and that so qualifying a *426 jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama Courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev’d in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App.1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).’ ”
Lee v. State, 44 So.3d 1145, 1161-62 (Ala.Crim.App.2009), quoting Sockwell v. State, 675 So.2d 4, 18 (Ala.Crim.App.1993).
“A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).”
Davis v. State, 718 So.2d 1148, 1157 (Ala.Crim.App.1995) (footnote omitted).
The circuit court committed no error in allowing the venire to be death-qualified.
VI.
Scott next argues that the circuit court erred in allowing the State to introduce hearsay evidence concerning a statement Scott’s father made after he arrived at the scene of the fire in the early morning hours of August 16, 2008.
Paramedic James Yarborough testified that about 20 minutes after he arrived Scott was in the ambulance and Scott’s parents and her mother-in-law arrived at the scene. He testified that when Scott’s father, Donald Bray, arrived Bray broke down and said to Scott: “What have you done?” (R. 1115.) Counsel objected and argued that Bray’s statement was inadmissible hearsay. The State asserted that the statement was an excited utterance; therefore, it argued, it was an exception to the hearsay rule. The circuit court held that the statement was admissible under Rule 803(2), Ala. R. Evid. (R. 1122.) Sgt. Brian Shackelford of the City of Russellville Police Department testified that when Scott’s family arrived at the scene of the fire, Scott got out of the ambulance to meet them. He said that Scott’s father was “really irate” and upset and that he screamed at Scott “Oh, my God. What’s— what have you done to my babies?” (R. 1260.) Scott objected and asserted 'that the statement was inadmissible hearsay. The circuit court overruled the objection. (R. 1260.) William Crenshaw, a volunteer firefighter, testified that an older man hollered at Scott: “What the hell have you done with my grandbabies? What the hell have you done? Where is my grandba-bies?” (R. 1291.) Scott did not object to this testimony. Christopher Aaron Nichols, an officer with the Russellville Police Department, testified that Scott’s family was “very, very emotional” and that when her father approached her he screamed, “What did you do to my grandbaby?” (R. 1312.) The circuit court allowed the statement to be received into evidence over Scott’s objection. (R. 1312.)
Rule 803(2), Ala. R. Evid., defines “excited utterance” as: “A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” “The excited utterance exception establishes no prerequisite that a declarant have *427 participated in the event or condition which caused the stress of excitement. The excited utterance of a bystanding observer is admissible the same as if the declarant had been a participant in the exciting occurrence.” C. Gamble and R. Goodwin, McElroy’s Alabama Evidence § 265.01(8) (6th ed 2009). See Harville v. State, 386 So.2d 776 (Ala.Crim.App.1980); Bass v. State, 375 So.2d 540 (Ala.Crim.App.1979).
The Alabama Supreme Court in Ex parte C.L.Y., 928 So.2d 1069 (Ala.2005), stated the following concerning this exception to the hearsay rule:
“ ‘[SJtrict contemporaneity should not be required .between the statement and the occurrence in order for the declaration to qualify for the present hearsay exception. Indeed, our courts have said that time alone is not a determining criterion and that applicability of this exception cannot be decided upon the basis of any specified time or number of minutes between the act and the declaration. The critical factor is whether the person who made the statement is still under, the influence of the emotions arising from the startling event. Stated differently, the statement does not have to be made contemporaneously with the startling event or condition but it must be uttered contemporaneously with the excitement resulting from the startling event or condition. How long the excitement prevails is largely determined by the character of the event or condition.’”
928 So.2d at 1072-73, quoting Charles W. Gamble, McElroy’s Alabama Evidence § 265.01(2) (5th ed.1996) (footnotes omitted).[3] “In deciding whether the declarant remained under the stress of excitement, the trial court may consider the context of the statement itself.” McElroy’s Alabama Evidence § 265.01(2). “The question of whether the statement is spontaneous in a given case is to be decided upon the facts and circumstances of that case, and such determination is a question for the trial court.” O’Cain v. State, 586 So.2d 34, 38 (Ala.Crim.App.1991).
Testimony showed that Bray had been called in the middle of the night to come to his daughter’s house because her house was on fire. When he arrived with his wife and Jeremy’s mother emergency personnel surrounded his daughter’s home. The content of the statement itself shows excitement based on a “startling event.” The circuit court correctly found that the statement was properly admissible as an excited utterance. See Ex parte C.L.Y. Thus, we find no error in the circuit court’s admission of Bray’s statement to S.cott.
VII.
Scott next argues that the circuit court erred in allowing evidence of other fires in houses inhabited by Scott to be introduced at her trial. Specifically, Scott argues that the court misapplied Rule 404(b), Ala. R. Evid., because, she argues, there was no evidence that Scott started the other fires.
The record shows that Scott moved in limine that the State be prohibited from offering testimony concerning other fires. (C.R. 323.) The State gave notice, pursuant to Rule 404(b), Ala. R. Evid., of its intent to introduce evidence of six other fires: (1) a fire in January 1985 at Scott’s father’s house; (2) a fire in July 1985 at Scott’s father’s house; (3) a fire in January 1990 at Scott’s father’s house; (4) a fire in March 1999 on property owned by Scott’s father; (5) a fire on January 12, 2006, at Scott’s house; and (6) a fire on January 14, 2006, at Scott’s house. The State asserted *428 that it intended' to introduce this evidence to show plan, motive, and identity. An extensive motion hearing was held on this issue. (R. 175-214.) At the hearing, the State made the following argument:
“On the 2006 fire, there’s two in 2006 that we have an abundance of evidence including people that were there at the fire, we have the fire marshal’s office that investigated that fire, we have the origin and cause examiner from the insurance company that he listed the fire as incendiary.
“We have the facts as far as Ms. Scott being the last one to leave those fires in both situations in 2006. We have a lot of details to those fires that we think would definitely establish a similar type of plan as [the prosecutor] already discussed to burn down houses to get insurance proceeds.
“And that is one of the reasons she was indicted in this case. One of three alternative counts was that Ms. Scott is indicted for, as far as a motive, for pecuniary gain. And in this case, the 2006 cases, it was the very same situations where the fire occurred two days apart, Ms. Scott was the last person to leave those fires, one fire was caused by the stove eye being left [on] and she was [the] last person to leave ■ that house.
“The second fire was ruled incendiary, and it started in right around the same area even though nobody was in the house for, at least, 12 hours prior to Ms. Scott’s entry to raise windows. And as soon as she left, within a short time period, the house burned again. And then, of course, she’s collected the full insurance proceeds for that house.
“These are very similar issues to this case in which she had taken out insurance policies the day before the fire on her son, and she also had her house insured with a very large amount of money at the time of which these houses — -the house burned down on Signore Drive.
“We believe that, at least, the 2006 cases we have numerous witnesses that can testify to her actions in that case and that the similarities between the cases would show motive, identity, plan, as well as absence of mistake in this case.
“And the motive, especially in this case being the fact that this was done for a pecuniary gain, which is alleged in the indictment, is a huge issue for us, and we believe the evidence is very telling that on 2006 fires the motives for the exact same purpose.”
(R. 184-86.)
The circuit court issued the following order granting the State’s request to introduce evidence concerning the two 2006 fires:
“The Court finds that the State may introduce evidence of the January 12, 2006, fire and the January 14, 2006, fire. The Court finds that these fires can be used in regard to show plan, motive, and identity. Any witness that has been listed by the State on its notice pertaining to these two fires will be permitted to testify. The Court finds that the probative value of this evidence outweighs any prejudicial effect.
“The Court finds that the 1985 fires, the 1990 fire, and the 1999 fires are excluded from evidence. The remoteness in time and dissimilar nature of these fires would keep these fires from falling under any exception under 404(b). Further, any probative value would be outweighed by the prejudicial effect of these fires.”
(C.R.378.)
Rule 404(b), Ala. R. Evid., states:
*429 “Evidence of other crimes, wrongs, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes such as-proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
Initially, we question whether the admission of evidence of the January 12, 2006, fire was governed by Rule 404(b), Ala. R. Evid., given that the undisputed testimony showed that this fire was accidental and was not incendiary in origin. As this Court stated in Ward v. State, 440 So.2d 1227 (Ala.Crim.App.1983):
“Appellant contends that the trial court erred in failing to exclude testimony of the prior unrelated fire of November 2, 1981, at his and his wife’s residence. Appellant contends that since no evidence was offered connecting either appellant or his wife with the first fire, the trial court erred in overruling his ‘motion in limine,’ or in the alternative, his motion for new trial. Appellant relies on Moreland v. State, 373 So.2d 1259 (Ala.Cr.App.1979), which states:
“ ‘of a person for the alleged commission of a particular crime, evidence of other acts which of themselves constitute distinct and independent offenses is not admissible.... [BJefore evidence of a second fire is introduced, there must be some legitimate evidence which would at least furnish a reasonable inference of the involvement of the accused.’
“(citations omitted)
“Moreland, supra, at 1261.
“Appellant cites to this court a correct proposition of law, but one that is inapplicable to the case at bar. Unlike Moreland, the State in the case sub judice never introduced evidence showing directly or by inference that the first fire on November 2,1981, was the result of criminal activity. Furthermore, there was no argument by the prosecution implying the same. As such, the prior fire cannot be said to constitute an ‘offense’ to which the general exclusionary rule applies.”
440 So.2d at 1229. See also Baxter v. State, 176 Ga.App. 154, 335 S.E.2d 607 (1985) (“[Tjhere was no contention by the state that these fires were the result of criminal activity on the part of appellant or anyone else; hence, the questioning cannot be considered an improper attempt to- in-, troduce evidence of prior offense.”); State v. Roberts, 250 Ga. 414, 415, 297 S.E.2d 274, 275 (1982) (“[W]e cannot find error in the admission of evidence of prior fires which were not shown to have been the result of criminal activity.”).
Even if the evidence of the fire that was ruled accidental was subject to review under Rule 404(b), Ala. R. Evid., we would find that evidence was correctly admitted for the following reasons.
A.
First, Scott argues that evidence of the two 2006 fires was not admissible because, she says, the State failed to establish sufficient evidence of Scott’s connection to the fires.
“When it is decided that prior crimes or acts of the accused are admissible to prove a proper purpose asserted under Rule 404(b), the question naturally arises as to what degree of proof is required to show such a prior criminal act. If the accused was convicted for *430 the former misconduct then, of course, the record of the conviction will generally suffice. However, if there was no conviction for the other crime or misconduct then it has been stated that the court should proceed slowly and require more than mere rumors and suspicions. Some courts require that extrinsic acts be proven beyond a reasonable doubt while others require clear and convincing proof. All of these tests, however, appear more strict than that applied in the courts of Alabama. The Alabama requirement is more like that now affirmed by the '• United States Supreme Court under which the judge must simply decide whether the evidence is sufficient for the jury to decide that the collateral act did occur and that the accused committed it.”
C. Gamble and R. Goodwin, McElroy’s Alabama Evidence § 69.02(4) (6th ed.2009) (emphasis added).
“In Huddleston v. United States, 485 U.S. 681, 687, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988), the United States Supreme Court ‘expressly declined to require a level of proof of at least a preponderance of the evidence before the trial court could allow evidence of an extrinsic act to go before the jury.’ Ex parte Hinton, 548 So.2d [562] at 567 [(Ala.1989)]. ‘Rather, “similar” acts evidence should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act.’ Huddleston, 485 U.S. at 685, 108 S.Ct. at 1499.”
Akin v. State, 698 So.2d 228, 235 (Ala.Crim.App.1996). “The judge is not required to be convinced beyond a reasonable doubt, by clear and convincing evidence, or by a preponderance of the evidence that defendant committed the extrinsic act.” State v. Haskins, 104 N.C.App. 675, 680, 411 S.E.2d 376, 380 (1991).
“In United States v. Herndon, 982 F.2d 1411 (10th Cir.1992), the defendant argued that similar acts evidence was irrelevant because the government had failed to prove that he had committed the earlier similar offense on which proof had been admitted. We noted that Huddleston [v. United States, 485 U.S. 681 (1988)] had ‘held that a trial court need not make a preliminary finding that the government proved the existence of the similar act’ by the defendant before submitting the similar acts evidence to the jury. Id. at 1415 (emphasis added). Obviously, as Huddleston and [United States v.] Beechum[, 582 F.2d 898 (5th Cir.1978),] make clear, the trial judge’s function is to determine only the presence of ‘sufficient evidence to support a finding by the jury that the defendant committed the similar act,’ id. (quoting Rule 404(b))—a ‘relevancy conditioned on fact’ question under Rule 104(b) as opposed to a preliminary question of admissibility of the type enumerated in Rule 104(a) (e.g., .qualification of a witness, existence of a privilege).”
United States v. Platero, 72 F.3d 806, 814 (10th Cir.1995).
In Briggs v. State, 549 So.2d 155 (Ala.Crim.App.1989), the defendant was convicted of arson and argued on appeal that the circuit court erred in admitting evidence of two earlier fires for which he had never been charged. Briggs argued on appeal that the prior fires were not admissible because he was never charged with those fires, that he was not seen starting those fires, and that the evidence was admitted only to show his propensity to commit the charged arson. In upholding the admission of the prior fires, we stated:
*431 “ ‘ “The general rule is that evidence of other crimes not charged in the indictment is inadmissible if its only purpose is to show the bad character, inclination or propensity of the accused to commit the type of crime for which he is being prosecuted.’” Barton v. State, 494 So.2d 943, 952 (Ala.Cr.App.1986) (citations omitted). See also, C. Gamble, McElroy’s Alabama Evidence, § 69.01(1) (3d ed.1977). However, evidence of distinct and independent offenses is admissible in the trial of a person accused of a specific crime when its purpose is to establish identity or a single plan, design, scheme, or system. Dowdell v. State, 480 So.2d 45 (Ala.Cr.App.1985).
“In the case sub judice, identity was very much in question at the appellant’s trial, as he denied setting fire to his estranged wife’s house, because there were no witnesses who could place him at the house at the time the blaze began. Evidence of the two fires that occurred in February 1987 was properly admissible in the present case as tending to prove that the appellant was the person who set the house fire.
“The appellant contends in his brief that he was never charged with the two earlier fires, that no one saw him set them, and therefore that'they should not have been allowed into evidence. In support of his argument, the appellant cites Williams v. State, 350 So.2d 708 (Ala.1977). Initially, this Court notes that, ‘[i]f the accused’s commission of another crime is otherwise competent and admissible under one of the exceptions to the general exclusionary rule, the state may prove his guilt of the' other crime by the same kind of evidence — both circumstantial and direct— that would be admissible if the accused were being tried for the other crime.’ McElroy’s Alabama Evidence, supra, at § 69.02(5). See also, Eslava v. State, 473 So.2d 1143, 1146 (Ala.Cr.App.1985).
“In this case, evidence showed that the clothes burned in the first of the two February 1987 fires had been in a closet in Ms. Briggs’s home immediately before the fire, and that the appellant was the only one in the' house at that time. Other evidence indicated that, although the appellant was not living in the house at the time of the second fire, he still had a key to the dwelling. Evidence also suggested that the appellant and Ms. Briggs were experiencing serious marital problems when the two fires occurred. In the opinion of this Court, this evidence was sufficient to connect the appellant to the two prior fires.”
549 So.2d at 158-59.
Here, the 2006 fires occurred in Scott’s house, the house was heavily insured at the time of the fires, Scott had increased the insurance on the house within months of the fires, Scott and her husband collected approximately in $185,000 in insurance as a result of the second fire, and Scott was the last person to leave the house before each fire. There was also testimony that Scott made a detailed account of the items that had been destroyed in the second fire to the extent that the list consisted of 109 pages and contained items valued at one dollar. Based on this Court’s holding in Briggs, the evidence presented was sufficient to connect Scott to the 2006 fires.
B.
Second, Scott argues that the pri- or fires were not admissible under the common-plan or identity exception to the general exclusionary rule.
“[T]he common plan, scheme, or design exception is ‘essentially coextensive with the identity exception,’ Ex parte Dar *432 by, 516 So.2d 786, 789 (Ala.1987), and ‘applies only when identity is actually at issue.’ ” Lewis v. State, 889 So.2d 623, 661 (Ala.Crim.App.2003).
When discussing this exception to the general exclusionary rule, the Alabama Supreme Court has stated:
“Rule 404(b) provides that evidence of a collateral act by the defendant is not admissible to prove the bad character of the defendant. '* “Evidence of prior [or subsequent] bad acts of a criminal defendant is presumptively prejudicial to the defendant.” ’ Bolden v. State, 595 So.2d 911, 913 (Ala.Crim.App.1991), cert. denied, 595 So.2d 914 (Ala.1992) (quoting Ex parte Cofer, 440 So.2d 1121, 1124 (Ala.1983)). However, such evidence is admissible for other material purposes, including proof of identity. Rule 404(b). Collateral-act evidence is admissible to prove identity only when the identity of the person who committed the charged offense is in issue and the charged offense is committed in a novel or peculiar manner. C. Gamble, McElroy’s Alabama Evidence § 69.01(8) (5th ed.1996); Ex parte Arthur, 472 So.2d 665 (Ala.1985); and Robertson v. State, 680 So.2d 929 (Ala.Crim.App.1994). ‘Under the identity exception to the general exclusionary rule prohibiting the admission of other or collateral crimes as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged crime are “signature crimes” having the accused’s mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person.’ Bighames v. State, 440 So.2d 1231, 1233 (Ala.Crim.App.1983) (emphasis added). ‘[E]vidence of a pri- or crime is admissible only when the circumstances surrounding the prior crime and those surrounding the presently charged crime “exhibit such a great degree of similarity that anyone viewing the two offenses would naturally assume them to have been committed by the same person.” ’ Ex parte Arthur, 472 So.2d at 668 (quoting Brewer v. State, 440 So.2d 1155, 1161 (Ala.Crim.App.1983)). See also Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); and Govan v. State, 40 Ala.App. 482, 115 So.2d 667 (1959) (recognizing that the identity exception is applicable only where both the prior crime and the charged offense were committed in the same special or peculiar manner).”
Ex parte Baker, 780 So.2d 677, 679 (Ala.2000) (emphasis in original). See Annot., Admissibility, in Prosecution for Criminal Burning of Property, or for Maintaining Fire Hazard, of Evidence of Other Fires, 87 A.L.R.2d 891 (1963). See also State v. Lowther, 434 N.W.2d 747, 753 (S.D.1989) (“There was a similar sequential relationship between the January fire and the December fire. ■ Both fires occurred in the early morning hours when the mobile homes were unoccupied. In both cases, the point of the fire’s origin was a hole which burned through the floor with an electrical appliance nearby and the use of accelerants was suspected. Defendant had insurance on both structures and their contents and collected insurance proceeds after the January fire. These similarities suggest motive, plan, preparation, knowledge, and absence of accident.”); Kinser v. State, 501 N.E.2d 1041, 1043 (Ind.1986) (“Here, the challenged evidence revealed prior fires of heavily insured property owned by Appellant, incendiary in nature and showing signs of tampered-with electrical wiring.”); Epps v. State, 52 Md.App. 308, 318, 450 A.2d 913, 919 (1982) (“[In Ellerba v. State, 41 Md.App. 712, 398 A.2d 1250 (1979), we] recognized that a ‘common scheme or plan’ exception would have available if there had been evidence that *433 the appellant had started the fires to make and collect insurance claims.”).
In this case, the 2006 fires and the 2008 fire were in houses owned and occupied by Scott. Both homes were heavily insured at the times of the fires, Scott had increased her insurance within months of the fires, the Scotts received over $185,000 in insurance monies as a result of the second 2006 fire and over $250,000 as a result of the 2008 fire, Scott was the only adult present at the time of the fires, the smoke alarms had been disabled at the time of the fires, and the ignition source for each fire could not be determined. Based on the facts presented in this case, we find that evidence of the 2006 fires was admissible under the identity and common-plan exception to the general exclusionary rule.
C.
Scott next argues that the evidence of the other fires was not admissible to prove motive.
‘“Motive is defined as “an inducement, or that which leads or tempts the mind to do or commit the crime charged.” Spicer v. State, 188 Ala. 9, 11, 65 So. 972, 977 (1914). Motive has been described as “that state of mind which works to ‘supply the reason that nudges the will and prods the mind to indulge the criminal intent.’ ” [Charles Gamble, Character Evidence: A Comprehensive Approach 42 (1987).]
“ ‘Furthermore, testimony offered for the purpose of showing motive is always admissible. McClendon v. State, 243 Ala. 218, 8 So.2d 883 (1942). Accord, Donahoo v. State, 505 So.2d 1067 (Ala.Cr.App.1986). “‘It is permissible in every criminal case to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.’ McAdory v. State, 62 Ala. 154 [(1878)].” Nickerson v. State, 205 Ala. 684, 685, 88 So. 905, 907 (1921).’ ”
Hatcher v. State, 646 So.2d 676, 679 (Ala.1994) quoting Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988).
Moreover,
“ ‘ “ ‘Testimony going to show motive, though motive is not an element of the burden of proof resting on the state, is always admissible.’ ... Even slight evidence to show a motive for doing the act in a criminal case is not to be excluded, but should be left to the consideration of the jury.” Kelley [v. State ], 409 So.2d [909] at 914 [ (Ala.Cr.App.1981) ] (emphasis omitted).’ ”
Siler v. State, 705 So.2d 552, 556-57 (Ala.Crim.App.1997), quoting Giddens v. State, 565 So.2d 1277, 1281 (Ala.Crim.App.1990).
“Although motive is not an element of the offense, and is not a matter that must be proven by the state nor a fact to be submitted to the jury for their determination, where the evidence against the accused is entirely circumstantial, its presence or absence is of great significance in determining the sufficiency of the evidence.” 6A C.J.S. Arson § 64 (2012). “Evidence of life insurance on the life of the victim which benefits the accused is relevant in a murder prosecution to show motive.” State v. Stenson, 132 Wash.2d 668, 706, 940 P.2d 1239, 1259 (1997). “While it is true that it is not necessary for the prosecution to prove a motive for murder, if a motive is proveable, it certainly is relevant to a material issue which the state must prove — the guilt of the accused.” Fountain v. State, 681 S.W.2d 858, 864 (Tex.App.1984). “Insurance coverage is relevant evidence of motive. Although motive is not an element of first-degree murder, it is evidence of intent. The greater the amount of insurance, the *434 greater [the defendant’s] motive for killing [the victim].” State v. Clay, 115. Wis.2d 697, 841 N.W.2d 417 (1983). (unpublished memorandum).
Evidence of the 2006 fires was properly-admitted under the motive exception to the general exclusionary rule.
However, our analysis does not end here. In Ex parte Jackson, 33 So.3d 1279 (Ala.2009), the Supreme Court cautioned that before Rule 404(b) evidence may be admitted the evidence must be “reasonably necessary to [the State’s] case” and its probative value must outweigh any prejudicial impact. 33 So.3d at 1286. Rule 403, Ala. R. Evid., provides that evidence “may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” (Emphasis added.) In addressing Rule 403, Ala. R. Evid., this Court has stated:
“ ‘The basis for the evidentiary rule excluding evidence of the accused’s commission of crimes not charged in' the indictment “lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them.” [C. Gamble,] McElroy’s [Alabama Evidence] at § 69.01(1) [(3d ed.1977)]. Consequently, not only must it be determined that the other offenses are material and relevant to an issue other than the character of the accused and fall within an exception to the exclusionary rule, but the probative value must not be substantially outweighed by undue prejudice.
“ ‘ “Judicial inquiry does not end -with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an- exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects. United States v. Turquitt, 557 F.2d 464, 468-69 (5th Cir.1977) (citations omitted).
“ ‘However, it is “only when the probative value of evidence is ‘substantially outweighed by the danger of unfair prejudice,’ ... that relevant evidence should be excluded.” United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir.1982) (emphasis in original). “[T]he probative value of the evidence of other offenses must also be balanced against its ‘prejudicial nature’ to determine its admissibility. ‘Prejudicial’ is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.’ State v. Daigle, 440 So.2d 230, 235 (La.Ct.App.1983).
“ ‘ “Of course, ‘prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.’ State v. Hurd, Me., 360 A.2d 525, 527 n. 5 (1976), quoting McCormick, Handbook on the Law of Evidence § 185 at 439 n. 31 (2nd ed.1972).”
“ ‘State v. Forbes, 445 A.2d 8, 12 (Me.1982).’ ”
*435 Draper v. State, 886 So.2d 105, 120 (Ala.Crim.App.2002), quoting Averette v. State, 469 So.2d 1371, 1373-74 (Ala.Crim.App.1985).
Here, Scott denied starting the fire, and the evidence against Scott was circumstantial. Evidence of the 2006 fires at Scott’s house was crucial to the State’s case to prove the identity of the perpetrator of the 2008 fire and the motive behind the 2008 fire. We cannot say that the admission of evidence of the 2006 fires was “unduly prejudicial” to Scott or that it caused the jury to convict her for improper reasons.
Last, in Ex parte Billups, 86 So.3d 1079 (Ala.2010), the Alabama Supreme Court held that the court must instruct the jury on the purpose for which the evidence was admitted and not merely recite to it the “laundry list” of Rule 404(b) exceptions. The Court stated:
“By simply reciting the complete ‘laundry list’ of permissible theories under Rule 404(b), the trial court’s instruction in this case gave the jury inadequate guidance. See Ex parte Belisle, 11 So.3d 323, 333 (Ala.2008) (‘[A]n appellate court “presume[s] that the jury follows the trial court’s instructions unless there is evidence to the contrary.” ’ (quoting Cochran v. Ward, 935 So.2d 1169, 1176 (Ala.2006))). The trial court’s instruction also failed to limit the State to the purposes — as nonspecific as they were — that it advanced in support of admission of the evidence regarding Bill-ups’s involvement in the Avanti East killings. Thus, we conclude that the trial court erred by failing to limit the jury’s consideration of that evidence to only those purposes for which the evidence was purportedly offered by the State (plan, identity, motive, and intent). See Huddleston [v. United States, 485 U.S. 681 (1988); cf. United States v. Tse, 375 F.3d 148, 158 (1st Cir.2004) (finding that the district court ‘adequately limited the jury’s consideration of [certain Rule 404(b) ] evidence’ when the court instructed the jury that it could not use that evidence ‘to make a propensity inference’ and that the jury could use that evidence to determine only the defendant’s ‘knowledge and intent’).”
Ex parte Billups, 86 So.3d at 1086.
In this case, when evidence of the 2006 fires was admitted, the court gave the jury the following instruction:
“Now, the law says any evidence concerning any other fire cannot be used as evidence to prove the character of the defendant in order to show action and conformity therein. The state in this case is being allowed to show this evidence as to plan, motive, and identity.
“The evidence of the past fire cannot be used as substantive evidence that the defendant committed this charged offense that she is charged with now.”
(R. 1185.)
For the reasons set out above, we hold that the circuit court did not abuse its discretion in allowing evidence of the 2006 fires to be admitted. See Briggs, supra.
VIII.
Scott next argués that the circuit court erred in allowing evidence of how Scott treated Mason. The record shows that four witnesses testified concerning Scott’s disciplining Mason in their presence. Scott asserts that the admission of this evidence violated Rule 404(b), Ala. R. Evid.
The record shows that Carolyn Scott, the owner of Hello Gorgeous, a hair salon used by the Scotts, testified that she had seen Scott yell at Mason and spank him when they were in the salon. Scott objected and argued that this evidence was irrelevant. (R. 2700.) The court allowed the *436 evidence to be admitted. Keyla McKinney, a hair stylist at Hello Gorgeous, testified that she had seen Scott upset with Mason, that she had seen Scott grab Mason, and that she had seen Scott spank Mason. Scott did not object to McKinney’s testimony. Ashley Pharr, a hair stylist at Hello Gorgeous, testified that she had seen Scott hit Mason on the back of the head and “pop” him on the leg and that Scott disciplined Mason more than her other son. Anna Kay Greenhill, a hair stylist at Hello Gorgeous, testified that she had seen Scott angry at Mason, that she had seen Scott “whoop” Mason on his legs and arms, and that she had heard Scott yell at Mason. Scott did not object to Greenhill’s testimony. Christie Franks testified that her son attended preschool with Mason. She testified that she had seen Scott yell at Mason and handle him “firmly.” Scott did not object to Franks’s testimony.
Although we question the applicability of Rule 404(b), Ala. R. Evid., to the above testimony, other courts have held that the scope of Rule 404(b), Ala. R. Evid., is broad. The United States Court of Appeals for the First Circuit has stated:
“Rule 404(b) allows evidence of ‘crimes, wrongs, or acts’ to be introduced. This disjunctive terminology shows unmistakably that Rule 404(b) reaches conduct which is neither criminal nor unlawful so long as the conduct is probative of, and revelatory as to, a permitted purpose.”
United States v. Devin, 918 F.2d 280, 286 (1st Cir.1990).
The United States Court of Appeals for the Second Circuit has stated:
“By its very terms, Rule 404(b) addresses ‘other crimes, wrongs, or acts.’ (emphasis added). Nothing about these words implies that the ‘other ... acts’ to which Rule 404(b) refers must be ‘bad.’ Indeed, to read the Rule as such ‘violate[s] the cardinal principle of statutory interpretation that courts must “give effect, if possible, to every clause and word of a statute.” ’ Trieestman v. United States, 124 F.3d 361, 375 (2d Cir.1997) (quoting United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)). While crimes, wrongs, or bad acts may be more likely than other kinds of acts to demonstrate criminal propensity and thus be inadmissible for that reason under Rule 404(b), the Rule itself is in no sense limited to such acts. Each of our sister Circuits to consider the issue has concluded that Rule 404(b) extends to non-criminal acts or wrongs, and we now join them.”
United States v. Scott, 677 F.3d 72, 74 (2d Cir.2012). See also United States v. Terebecki, 692 F.2d 1345, 1348 n. 2 (11th Cir.1982). “To fall within the scope of Rule 404(b), an act need not be criminal so long as it tends to impugn a defendant’s character.” United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir.1988). “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte hoggins, 771 So.2d 1093, 1103 (Ala.2000). “The admission or exclusion of evidence is a matter within the sound discretion of the trial court.” Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000).
Alabama has long held that “[t]he prosecution may prove former acts of hostility by the accused toward the victim for the purpose of showing motive and malice.” Carroll v. State, 370 So.2d 749, 759 (Ala.Crim.App.1979). See also Phelps v. State, 435 So.2d 158, 163 (Ala.Crim.App.1983).
“In a prosecution for murder, evidence of former acts of hostility between the *437 accused and the victim are admissible as tending to show malice, intent, and ill will on the part of the accused. Bennefield v. State, 281 Ala. 283, 286, 202 So.2d 55, 58 (1967); Blue v. State, 246 Ala. 73, 81, 19 So.2d 11, 18 (1944). ‘In a prosecution for the murder of a wife by her husband, their general relations toward each other and evidence of actual cruelty by the defendant upon his wife prior to the shooting are admissible on the question of whether the shooting was intentional or accidental ... and on the questions of malice and intent.’ Akers v. State, 399 So.2d 929, 931 (Ala.Cr.App.1981) (citations omitted).”
White v. State, 587 So.2d 1218, 1230 (Ala.Crim.App.1990). “Evidence of recent abuse to the deceased child by the defendant is admissible to show intent, motive or scienter. Layne v. State, 54 Ala.App. 529, 534, 310 So.2d 249 (1975), and cases cited; Cameron v. State, 24 Ala.App. 438, 136 So. 418 (1931).” Carroll v. State, 370 So.2d 749, 759 (Ala.Crim.App.1979).
The circuit court did not abuse its discretion in allowing evidence concerning Scott’s treatment of Mason.
Scott further argues that the circuit court erred in allowing testimony of Scott’s post-fire conduct which, she says, was irrelevant and prejudicial.
The record shows that Melinda Swinney, a stylist in a hah’ salon at a Wal-Mart discount store, testified that on Monday after the Saturday fire she saw Scott. Swinney said that she asked Scott how she was doing and she said: “I’m fine. How are you?” (R. 2721.) She said that Scott showed no emotion. Scott did not object to this testimony. Jana Boyd, a stylist at the Wal-Mart hair salon, testified that a lady came in the store on the Monday after the fire and that Swinney got upset and Boyd had to wait on the customer.
Anna Kay Greenhill, an employee of Hello Gorgeous, testified that on Saturday at around 2:00 p.m. on the day of the fire Scott and Jeremy came to the salon for Jeremy to get a haircut. Scott showed no emotion, she said, she did not mention her son the entire time, and Scott and her husband bantered back and forth about the length of his hair.
“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Rule 401, Ala. R. Evid: “Alabama recognizes a liberal test of relevancy....” Hayes v. State, 717 So.2d 30, 36 (Ala.Crim.App.1997). “[A] fact is admissible against a relevancy challenge if it has any probative value, however slight, upon a matter in the case.” Knotts v. State, 686 So.2d 431, 468 (Ala.Crim.App.1995).
“Any indications of conscious guilt arising from the conduct, demeanor, or expressions of an accused are legal evidence against him. ‘The law can never limit the number or kind of such indications.’ Johnson v. State, 17 Ala. 618, 624 (1850). ‘The number of such indications is impossible to limit, nor can their nature or character be defined.’ McAdory v. State, 62 Ala. 154, 159 (1878).”
Conley v. State, 354 So.2d 1172, 1179 (Ala.Crim.App.1977)
“Whenever a person is on trial for a criminal offense, evidence of the defendant’s post-crime conduct that may fairly be inferred to have been influenced by the criminal act is admissible. The post-crime conduct of the defendant shows his or her state of mind which has been characterized by our courts as consciousness of guilt, and may be admitted as circumstantial evidence of guilt. Conley v. State, 354 So.2d 1172, 1179 *438 (Ala.Cr.App.1977). When post-crime conduct is introduced as circumstantial evidence of a defendant’s guilt, there must be a link between the defendant and the evidence. See Stewart v. State, 398 So.2d 369, 375 (Ala.Cr.App.), cert. denied, 398 So.2d 376 (Ala.1981); see C. Gamble, McElroy’s Alabama Evidence, § 190.03 (5th ed.1996).”
Ballard v. State, 767 So.2d 1123, 1130 (Ala.Crim.App.1999).
“A person’s post-crime behavior often is considered relevant to the question of guilt because the particular behavior provides clues to the person’s state of mind. The reason why a person’s post-crime state of mind may be relevant is because, as Professor Wigmore suggested, the commission of a crime can be expected to leave some mental traces on the criminal. 1 Wigmore, [Evidence] § 173, at 632 [(3d ed. 1940)].”
Thomas v. State, 372 Md. 342, 352, 812 A.2d 1050, 1056 (2002). See State v. Day, 51 Wash.App. 544, 552, 754 P.2d 1021 (1988) (testimony that defendant showed no reaction to news of wife’s death was properly admitted).
Testimony of Scott’s actions after the fire and the death of her son was relevant to Scott’s guilt and was properly admitted.
IX.
Scott next argues that the circuit court erred in allowing Deputy James Edwards of the Alabama State Fire Marshal’s Office to testify about Scott’s demeanor during her interview.
The record shows that Deputy Edwards testified that he interviewed Scott on August 26, 2008. Deputy Edwards read Scott’s statement to the jury. On cross-examination, defense counsel asked Deputy Edwards whether he used “kinesic interview techniques” when he conducted interviews and he asked Deputy Edwards to define those techniques. Defense counsel then asked Deputy Edwards about what Scott meant when she said: “I don’t want to talk anymore. I’m leaving.” (R. 1787.) Deputy Edwards responded that Scott was trying to take control of the interview. On redirect examination by the State, the following occurred:
“[Prosecutor]: Is that something that you notice or something is involved in kinesics when persons leave long periods of silence before answering questions?
“[Deputy Edwards]: Yes. It could be, yes.
“[Prosecutor]: Is that again — what does that usually infer to you or tell you?
“[Deputy Edwards]: They’re trying to think of—
“[Defense counsel]: We object to what is usually inferred.
“[Prosecutor]: I’ll rephrase the question.
“The Court: Okay. Go ahead.
“[Prosecutor]: What is inferred to you in this case by the long silences of—
“[Defense counsel]: Objection, Your Honor. It calls for speculation and conclusion and mental operation of another person.
“The Court: Overruled.
“[Deputy Edwards]: I’m sorry, could you repeat it one more time?
“[Prosecutor]: What is inferred — what did you infer from her actions as far as long dead periods or long periods of silence in answering questions?
“[Defense counsel]: Objection, Your Honor. Same objection.
“The Court: Overruled.
“[Deputy Edwards]: With the long pauses, again, with truthful answers, they come pretty quick. You ask a question, they answer right away. When they are trying to deviate from *439 what may actually be truthful, you may have them where you ask—
“[Defense counsel]: Objection as to what may happen, Your Honor.
“[Prosecutor]: He’s going into more explanation as to why—
“The Court: Just address it specifically to this case.
“[Deputy Edwards]: Yea, I was concerned she was trying to think of what the answer should be than, necessarily, what it actually is.”
(R. 1796-98.)
The challenged conduct occurred on redirect examination. “The purpose of redirect examination is ‘to answer any matters brought out on the cross-examination of the witness by [the] adversary.’ ” Sistrunk v. State, 596 So.2d 644, 647 (Ala.Crim.App.1992). “The prosecution was entitled, on redirect, to further explore matters elicited during cross-examination by defense counsel.” Mangione v. State, 740 So.2d 444, 455 (Ala.Crim.App.1998).
“ ‘The appellant cannot be heard to complain “‘about exploration of the issue ... which he himself improperly injected into the trial.’ [Morgan v. State, 440 So.2d 1240, 1241 (Ala.Cr.App.1983)]. ‘Rebuttal evidence, even evidence of pri- or crimes, is generally admissible within the sound discretion of the trial Court. Vincent v. State, 231 Ala. 657, 165 So. 844 (1936); Jones v. State, [362 So.2d 1303 (Ala.Cr.App.1978)]; Norris v. State, 429 So.2d 649 (Ala.Cr.App.1982).’ Peterson v. State, 452 So.2d 1372 (Ala.Cr.App.1984).” Campbell v. State, 508 So.2d 1186, 1189 (Ala.Cr.App.1986). “The state may examine a witness on redirect as to matter injected into a case on cross-examination by the defense.” Hollingsworth v. State, 549 So.2d 110, 111 (Ala.Cr.App.1988), and cases cited therein.’ ”
Brown v. State, 11 So.3d 866, 903 (Ala.Crim.App.2007), quoting Walker v. State, 631 So.2d 294, 301 (Ala.Crim.App.1993).
 In Ex parte D.L.H., 806 So.2d 1190 (Ala.2001), the Alabama Supreme Court stated:
“When one party opens the door to otherwise inadmissible evidence, the doctrine of ‘curative admissibility’ provides the opposing party with ‘the right to rebut such evidence with other illegal evidence.’ McElroy’s Alabama Evidence, § 14.01, p. 49 (5th ed.1996). ‘[T]he law [is] that even though a party introduces evidence that may be immaterial or illegal, his opponent has the right to rebut such evidence and this right is unconditional.’ Clark v. State, 54 Ala.App. 183, 186, 306 So.2d 51, 54 (1974). ‘ “A party who has brought out evidence on a certain subject has no valid complaint as to the trial court’s action in allowing his opponent or adversary to introduce evidence on the same subject.” ’ Hubbard v. State, 471 So.2d 497, 499 (Ala.Crim.App.1984) (quoting Brown v. State, 392 So.2d 1248, 1260 (Ala.Crim.App.1980), cert. denied, 392 So.2d 1266 (Ala.1981)).”
806 So.2d at 1193. “These rules apply even where the testimony on redirect examination concerns other criminal conduct by the defendant.” Sistrunk, 596 So.2d at 647.
, j ] ] ; ] < Scott opened the door to testimony concerning her demeanor during her entire interview when she first elicited testimony regarding her purposes in the interview process during cross-examination. The prosecutor’s questions were within the proper scope of rebuttal examination. Accordingly, we find no reversible error.
X.
i Scott next argues that she was precluded from presenting her defense because, *440 she says, the State lost crucial evidence— two electrical outlets removed from Mason’s bedroom. Specifically, she argues that the circuit court erred in failing to suppress the testimony of Dr. Raphael Franco, a State expert in the field of electrical engineering and electricity, who testified that electricity was not the cause of the fire; that the court failed to apply the three-part test set out in Ex parte Gingo, 605 So.2d 1237 (Ala.1992); and that the State was responsible for the critical lost evidence that was not available to prove her theory of defense.
The record shows that Scott moved to dismiss the charges at various times throughout the course of the trial. Before trial, Scott moved to dismiss the indictment, arguing that the State had failed to disclose the outlets that had been taken from Mason’s bedroom. Scott further asserted that she was not alleging, at that time, any bad faith on the part of the State. (R. 340.) The State responded that it had only learned in April 2009 that the outlet receptacles were missing and that dismissal of the charges was not the appropriate remedy. (R. 369.) The circuit court denied the motion and indicated that it would entertain the motion at a later date if anything else developed. (R. 1489.) During Cpt. Steve Thornton’s testimony the circuit court indicated that it would allow the outlet in Cpt. Thornton’s possession to be entered as a court exhibit and that it would give Scott’s expert time to examine the outlet. In her motion for a new trial, Scott again raised this issue. When denying this motion, the court stated:
“All testimony indicated that there was no showing that anyone intentionally destroyed any evidence or acted in bad faith. Any lost receptacle was done unintentionally or negligently. Further, [Scott’s] experts testified the fire began close to a television in the child’s room. The missing outlet is not relevant to this theory of what caused the fire. To argue that the Defense experts might argue a different theory if the outlet was produced, is not credible.”
(C.R.578.)
Scott relies on the Alabama Supreme Court’s decision in Ex parte Gingo to support her argument. In discussing the Supreme Court’s decision in Gingo, this Court in Gurley v. State, 639 So.2d 557 (Ala.Crim.App.1993), stated:
“In Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the police failed to refrigerate a sodomy victim’s semen-stained clothing. Therefore, the clothing could not be subjected to tests the results of which might have exonerated the accused. At trial, the prosecution presented evidence that the victim had identified the accused as his assailant, but it did not introduce any evidence pertaining to the victim’s clothing in its case-in-chief.
“The United States Supreme Court held that ‘unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.’ 488 U.S. at 58, 109 S.Ct. at 337. The Court explained its holding as follows:
“ ‘The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have *441 been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in [California v.] Trombetta, [467 U.S. 479, 486, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984),] that “[wjhenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.” Part of it stems from our unwillingness to read the “fundamental fairness” requirement of the Due Process Clause, see Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police’s obligation to preserve evidence to reasonable bounds and confínes it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.’
“Youngblood, 488 U.S. at 57-58, 109 S.Ct. at 337. Concurring in the judgment, Justice Stevens wrote:
“ ‘[Although it is not possible to know whether the lost evidence would have revealed any relevant information, it is unlikely that the defendant was prejudiced by the State’s omission. In examining witnesses and in her summation, defense counsel impressed upon the jury the fact that the State failed to preserve the evidence and that the State could have conducted tests that might well have exonerated the defendant. More significantly, the trial judge instructed the jury: “If you find that the State has ... allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State’s interest.” As a result, the uncertainty as to what the evidence might have proved was turned to the defendant’s advantage.
“ ‘... In declining defense counsel’s and the court’s invitation to draw the permissive inference, the jurors in effect indicated that, in their view, the other evidence at trial was so overwhelming that it was highly improbable that the lost evidence was exculpatory. In Trombetta, this Court found no due process violation because “the chances [were] extremely low that preserved [breath] samples would have been exculpatory.” [Trombetta, 467 U.S.] at 489, 104 S.Ct. at 2534. In this case, the jury has already performed this calculus based on its understanding of the evidence introduced at trial. Presumably, in a case involving a closer question as to guilt or innocence, the jurors would have been more ready to infer that the lost evidence was exculpatory.
“ ‘With these factors in mind, I concur in the Court’s judgment. I do not, however, join the Court’s opinion because it announces a proposition of law that is much broader than necessary to decide this case. It states that ‘unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.’ In my opinion, there may well be cases in which the defendant is unable to *442 prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair. This, however, is not such a case.’
“Youngblood, 488 U.S. at 59-61, 109 S.Ct. at 338-39 (Stevens, J., concurring in the judgment) (citations to the record omitted).
“Following Youngblood, this court decided State v. Gingo, 605 So.2d 1233 (Ala.Cr.App.1991). In that case, the defendants were indicted for disposing of hazardous wastes at an unpermitted site. Both the Alabama Department of Environmental Management and the Environmental Protection Agency had collected and analyzed test samples of the waste material. In response to a defense motion for production of the test samples, the State had notified the defendants that the samples no longer existed. The circuit court suppressed the test results because the defendants had been denied access to ‘“potentially exculpatory material.” ’ Gingo, 605 So.2d at 1236.
“This Court reversed the circuit court’s suppression order on the authority of Youngblood. We held that ‘the destruction of the test samples ... did not deny the defendants due process of law because those defendants have failed to show any “bad faith” on the part of the prosecution.’ Gingo, 605 So.2d at 1236-37.
“However, the Alabama Supreme Court disagreed with our reliance on Youngblood and, in Ex parte Gingo, 605 So.2d 1237 (Ala.1992), cert. denied, 506 U.S. 1049, 113 S.Ct. 967, 122 L.Ed.2d 123 (1993), reversed this Court’s decision. The Court distinguished Young-blood on its facts, finding that ‘the test results [on the waste material] were part of the State’s case-in-chief, i.e., the State had to use those test results to carry its burden of proving the hazardous waste violations.’ Ex parte Gingo, 605 So.2d at 1240. Quoting Justice Stevens’ special concurrence in Youngblood, our Supreme.Court further observed:
“ ‘Although to show bad faith, for the purpose of showing a due process violation, the defendant must show that the State had knowledge of the exculpatory value of the destroyed evidence, “there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.” Youngblood, 488 U.S. at 67, 109 S.Ct. at 342 (Stevens, J., concurring in the result). We think that this is such a case.’
“Ex parte Gingo, 605 So.2d at 1241.
“Because it focused on the fact that the test results in Gingo were ‘part of the State’s case-in-chief,’ and were ‘necessary to convict the defendants,’ 605 So.2d at 1240, the Alabama Supreme Court appears to have aligned itself with the ‘materiality and prejudice analysis’ advocated by Justice Stevens, several commentators, and a growing minority of other courts that have rejected Youngblood’s single ‘bad faith’ standard. See, e.g., Note, The Role of Police Culpability in Leon and Youngblood, 76 Va.L.Rev. 1213 (1990), wherein the author explains that Youngblood did not establish a test balancing the materiality of the lost evidence against the culpability of the police for the loss. Instead, Youngblood
“ ‘created a single requirement that a defendant must meet to establish a constitutional violation: the defendant must show that, in destroying the evi *443 dence, the police acted in bad faith, If the defendant fails to make this showing, there is no constitutional violation and there is no relief.’
“76 Va.L.Rev. at 1213 (emphasis added). See also Jones v. McCaughtry, 775 F.Supp. 309, 315 n. 17 (W.D.Wis.1991), affirmed, 965 F.2d 473 (7th Cir.1992), cert. denied, 506 U.S. 929, 113 S.Ct. 360, 121 L.Ed.2d 272 (1992) (‘[i]t is worth noting ... that neither Justice Stevens (concurring in the judgment only) nor Justice Blackmun (dissenting) read the majority opinion in Youngblood as adopting anything short of a flat bad faith requirement, absent which there is no need for any materiality inquiry’) (emphasis added).
“The majority of courts addressing due process claims based on lost or destroyed evidence have not found constitutional violations in the absence of Youngblood’s ‘flat bad faith requirement.’ See, e.g., United States v. Hamell, 931 F.2d 466, 469 (8th Cir.), cert. denied, 502 U.S. 928, 112 S.Ct. 347, 116 L.Ed.2d 286 (1991); United States v. Westerdahl, 727 F.Supp. 1364 (D.Ore.1989), affirmed in part and reversed in part, 945 F.2d 1083 (9th Cir.1991) (disapproving district court’s use of a test balancing culpability of police, materiality of lost evidence, and prejudice to accused); United States v. Rodriguez, 917 F.2d 1286, 1291-92 (11th Cir.1990), cert. denied, 502 U.S. 1047, 112 S.Ct. 911, 116 L.Ed.2d 811 (1992); People v. Stallings, 211 Ill.App.3d 1032, 156 Ill.Dec. 344, 348-49, 570 N.E.2d 820, 824-25, appeal denied, 141 Ill.2d 556, 162 Ill.Dec. 504, 580 N.E.2d 130 (1991).
“In contrast to the ‘flat bad faith requirement’ of Youngblood, some commentators and a growing minority of appellate courts have proposed that trial judges dealing with lost or destroyed evidence focus not only on the culpability of the police but also on ‘the materiality of the [lost] evidence ... the type of evidence and the impact it could have had at trial.’ Note, 76 Va.L.Rev. at 1242. See generally State v. Steffes, 500 N.W.2d 608 (N.D.1993), wherein the court observed:
“ ‘Relying upon state constitutional law, some states hold that even in situations where defendants cannot show bad faith on the part of the state in failing to preserve material evidence, defendants may nonetheless be entitled to an adverse-inference instruction, dismissal, or new trial if they can make a sufficient showing of substantial prejudice. These states take authority from Justice Stevens’s concurring opinion in Arizona v. Youngblood wherein he wrote: “there may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair.” ...
“ ‘Fairness and an aversion to prejudice have prompted these states to look to their state constitutions to build upon, further expand, or limit the Arizona v. Youngblood test to encompass an “unfair prejudice” prong — either in addition to or at the expense of the .bad faith prong. These jurisdictions hold that when the state loses or destroys evidence, the state is subjected to a higher due process standard under their state constitutions than the bad faith test as stated in Arizona v. Youngblood. See, e.g., Lolly v. State, 611 A.2d 956 (Del.1992); State v. Riggs, 114 N.M. 358, 838 P.2d 975 (1992); State v. Schmid, 487 N.W.2d 539 (Minn.Ct.App.1992); Commonwealth v. *444 Henderson, 411 Mass. 309, 582 N.E.2d 496 (1991); State v. Matafeo, 71 Haw. 183, 787 P.2d 671 (1990); State v. Smagula, 133 N.H. 600, 578 A.2d 1215 (1990); Spaulding v. State, 195 Ga.App. 420, 394 S.E.2d 111 (1990); Thorne v. Department of Public Safety, 774 P.2d 1326 (Alaska 1989); State v. Fain, 116 Idaho 82, 774 P.2d 252 (1989). See also, State v. Youngblood, 173 Ariz. 502, 844 P.2d 1152 (1993) [Feldman, C.J. concurring and dissenting]. Contra People v. Cooper, 53 Cal.3d 771, 281 Cal.Rptr. 90, 809 P.2d 865 (1991) [adopting Arizona v. Youngblood bad faith standard as a matter of state constitutional law].’
“State v. Steffes, 500 N.W.2d at 611-12 n. 3.
“The balancing approach taken by the Delaware Supreme Court in Hammond v. State, 569 A.2d 81, 87 (Del.1989), is representative of the approach used by other courts that have rejected Young-blood’s single bad faith standard. That approach is based on the premise that ‘fundamental fairness, as an element of due process, requires the State’s failure to preserve evidence that could be favorable to the defendant “[t]o be evaluated in the context of the entire record.” ’ Hammond, 569 A.2d at 87 (quoting United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976)) (emphasis added).
“The Delaware court noted that prior to Youngblood, it had employed a three-factor analysis to decide due process claims arising out of lost or destroyed evidence. In Hammond, ‘the State argue[d] that Youngblood has now established a single bright line “good faith” test which should be applied by this Court in lieu of the ... three-part analysis, whenever a denial of access is asserted with respect to evidence that could be favorable to the defendant.’ Hammond, 569 A.2d at 87 (emphasis in original). Declining to accept the State’s invitation to adopt a single bright line test, the Hammond court held:
“ ‘When evidence has not been preserved, the conduct of the State’s agents is a relevant consideration, but it is not determinative. Equally relevant is a consideration of the importance of the missing evidence, the availability of secondary evidence, and the sufficiency of the other evidence presented at trial.’
“Hammond, 569 A.2d at 87. The court supported the foregoing statement by citing the same quote from Justice Stevens’ concurrence in Youngblood that was acknowledged, in State v. Steffes, supra, to be the source of authority for jurisdictions rejecting Youngblood, and that was cited by the Alabama Supreme Court in Ex parte Gingo.
' “The Hammond court concluded that it would continue to rely on the following three-part analysis ‘pursuant to the “due process” requirements of the Delaware Constitution,’ 569 A.2d at 87:
“ ‘[I]f the duty to preserve evidence, has been breached, a Delaware court must consider “(1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence, considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to sustain conviction.” ’
“Id. (quoting Bailey v. State, 521 A.2d 1069, 1091 (Del.1987), and Deberry v. State, 457 A.2d 744, 752 (Del.1983)) (footnote omitted). See also State v. Shaw, 154 Vt. 648, 577 A.2d 286, 287 (1990) (wherein the court employed ‘ “a pragmatic balancing” of three factors: *445 (1) the degree of negligence or bad faith on the part of the government; (2) the importance of the evidence lost; and (3) other evidence of guilt adduced at trial’).
“This three-part analysis — which weighs culpability, materiality, and prejudice — is what the Alabama Supreme Court seems to have employed in Ex parte Gingo. In that case, the court considered not only the State’s accountability for destroying the evidence, but also the critical nature of the results of the tests on the allegedly hazardous waste and the defendants’ inability to refute those test results. But compare United States v. White, 766 F.Supp. 873, 884 (E.D.Wash.1991) (a case whose facts are virtually identical to Gingo, wherein the court, without commenting on the materiality of the evidence or the prejudice to the defendant from its loss, held that the destruction of test samples on allegedly hazardous, waste material did not amount to a due process violation in the absence of bad faith).
“We conclude that our Supreme Court has adopted in theory, if not in name, a multi-factor balancing test similar to the one used by the Delaware court in Hammond to determine whether the State’s loss or destruction of evidence constitutes a due process violation in any given ease. We also conclude that that balance will necessarily be drawn differently in every case because ‘fundamental fairness, as an element of due process, requires the State’s failure to preserve evidence that could be favorable to the defendant “[t]o be evaluated in the context of the entire record.” ’ Hammond, 569 A.2d at 87 (quoting United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976)) (emphasis added). See State v. Youngblood, 173 Ariz. 502, 844 P.2d 1152, 1161 (1993) (Feldman, C.J., concurring in part and dissenting in part) (‘The answer [to the question whether the accused had a fundamentally fair trial despite the State’s good faith failure to preserve evidence] is fact-intensive and depends on the quality and quantity of the other evidence, the type of evidence that was lost, its potential value for exculpatory purposes, and similar issues’).
“Since the decision in Ex parte Gingo, this court has employed an abbreviated ‘materiality and prejudice analysis.’ See Grissom v. State, 624 So.2d 706 (Ala.Cr.App.1993) (wherein this Court, before discussing the lack of bad faith, observed: ‘we are not prepared to say that the tape recording was so critical that the police’s destruction of the evidence rendered a fair trial impossible’) (emphasis added).”
Gurley v. State, 639 So.2d 557, 563-68 (Ala.Crim.App.1993). Compare Brent G. Filbert, Failure of Police To Preserve Potentially Exculpatory Evidence as Violating Criminal Defendant’s Rights Under State Constitution, 40 A.L.R.5th 113 (1996).
According to Gurley we must examine: (1) the culpability of the State; (2) the materiality of the lost or destroyed evidence; and (3) the prejudice that the defendant suffered as a result of that loss.
(1) Culpability of the State. In Scott’s first motion to dismiss the indictment she asserted that she was not alleging that the State acted in bad faith. Indeed, our review of the record fails to show that police officers, firefighters, or any other State officials acted in bad faith during the investigation of the fire/homicide.
(2) Materiality of the lost outlet. “To meet this standard of constitutional materiality ... evidence must both possess an exculpatory value that was apparent *446 before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.” California v. Trombetta, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).
A review of the evidence at Scott’s trial is essential when examining this issue: Cpt. Steve Thornton testified that he was present when the outlets were removed from Mason’s bedroom. Each outlet, he said, was cut at a different length so that the outlet could be matched to the wall receptacle and each outlet was photographed, from a 360-degree angle, to document its removal. Outlet number 1, the outlet behind Mason’s bed, was misplaced at the scene, and Russellville firefighters sifted through the debris for 8 to 10 hours to try and locate the outlet, but were unsuccessful. Cpt. Thornton further testified that outlet number 2, the outlet behind Noah’s bed, was never removed from the wall because it was “melted out”; this outlet was photographed. Outlet number 3 was located between Noah’s bed and the window but had been misidentified as coming from another room in the house. Outlet number 5 remained intact, he said, and was not removed from the wall. Cpt. Thornton testified that almost 2,000 photographs had been taken at the scene.
Dr. Raphael Franco, an electrical engineer, testified that he was contacted by an Alcohol, Tobacco, and Firearms agent to evaluate whether the -fire was electrical in origin. He went to the Scott residence and examined the fire scene. When he examined the scene, he said, outlet number 1 could not be located, but the electrical receptacle for that outlet was still in the wall. The outlets, he said, that had been removed were put back into place, and two outlets had not been removed from the wall. Dr. Franco testified that he took 425 photographs at the scene because he knew that his work would be reviewed by other electrical engineers. Though outlet number 1 could not be located, the receptacle that housed the outlet was there and the “wire insulation [was] still there and [was] undamaged.” (R. 2166.) Dr. Franco further testified that if a fire had started in outlet number 1, you would expect to see bare copper wire and melted insulation, which was not present in that receptacle. Concerning outlet number 2, Dr. Franco said: “[E]ven though the wire insulation is burned out here, consumed out here near these terminal screws inside that box, I still have wire insulation back here. And, again, if the fire had started in that box, this would have melted and it would have been consumed.” (R. 2175.) Outlet number 3 was not destroyed, and, in his opinion, no fire had occurred in that outlet. Outlet number 4, Dr. Franco said, contained “too much plastic” “that wasn’t consumed by the fire” for any fire to have been present in that outlet. (R. 2181.) Outlet number 5 had a power cord that led to the television. Dr. Franco testified:
“That bead tells me that it’s on the TV power cord. It says, I have to have electricity present when that occurred. Because that’s what caused that bead. And in order to have electricity present, I have to have electricity passing through receptacle number one, passing through receptacle two, through three, through four, through five, out to the cord.
“So what that tells me is that all that is intact, it’s uncompromised, and it’s still working.
[[Image here]]
“And looking at that, you know, I can basically say none of those receptacles— I didn’t have any problem with any of those receptacles. It’s literally impossible for me to have a fire over here in receptacle one that started over here. *447 Okay. And for it not to trip a breaker or not to cause problems, and I still have electricity over here in receptacle number five.”
(R. 2206-07.) It was Dr. Franco’s opinion that the fire was not electrical in origin.
James Munger testified that in his opinion the fire did not originate in the television cabinet because “[h]ad the fire started inside the television, and we’ve set fires inside of televisions in test scenarios in burn cells, it will basically cook its way down through whatever surface it is sitting on.” (R. 2633.) It was Munger’s opinion that the fire originated in the “quadrant of the room that contained Noah’s bed.” (R. 2650.)
Scott called two experts to testify concerning the cause of the fire. John Joseph Lentini, a fire-investigation consultant, testified that it was his opinion that the reason Noah’s bed had the heaviest damage was that the bed was near the window and when flashover broke the window the ventilation caused the excessive damage. Because of the high level of carbon monoxide in the victim’s blood — more than 90 percent — because the television cord had melted copper on the end, because there was fire behind the cabinet before the circuit breaker was tripped, it was Lenti-ni’s opinion that the fire was a closed-cabinet fire that originated in the cabinet that housed the television.
Douglas James Carpenter, a fire-protection engineer, stated that he examined the fire scene and the evidence. It was his opinion that the fire originated in the television cabinet. Carpenter testified that the basis for his conclusion was that the victim had a carbon-monoxide level in his blood that was greater than 90 percent which, he said, is extremely high:
“So in this particular case, a fire starting on the bed will not produce the extremely high levels of [carbon monoxide] found in the blood of the victim. Ninety percent is a very high [carbon monoxide] level. It should set off bells and whistles to investigators.
“All right. A fire starting within the television cabinet will produce the extremely high levels of [carbon monoxide] found in the blood of the victim.”
(R. 3234.) On cross-examination, Carpenter indicated that he had a “tremendous amount” of fire photographs and that he “had what [he] needed to arrive at [his] conclusions.” (R. 3287-88.)
The State took numerous photographs of the outlets after they had been loosened and pulled slightly from the wall but while they were still connected to the electrical wires, and still more photographs of the electrical boxes that housed the outlets. The photographs and the electrical boxes were available for examination by defense experts. Neither defense expert testified that faulty outlets were the cause of the fire; rather, they testified that the fire started in the television cabinet in the boys’ room. The outlet receptacles were all in place, numerous- photographs were taken of the outlets, one of Scott’s experts testified that he had everything he needed to make a conclusion concerning the cause of the fire, and neither of Scott’s experts testified that the fire originated in the area that housed the missing outlet. Given the unique circumstances presented in this case, we cannot say that the missing evidence was material to Scott’s defense.
(3) Prejudice to Scott. Based on our discussion above, we find no evidence that Scott suffered any prejudice as a result of the lost evidence, given that it was not material to Scott’s defense.
After evaluating the above factors, we are confident that the loss of outlet number 1 and the late disclosure of outlet *448 number 3 did not deprive Scott of her ability to present her defense.
Scott next contends that the circuit court erred when it failed to give' the jury an adverse-inference instruction that the State’s loss of the outlet was a basis for doubting Dr. Franco’s conclusions regarding the conditions of the outlets. Scott cites the case of Gurley v. State, 639 So.2d 557 (Ala.Crim.App.1993), to support her argument.
The record shows that Scott requested jury instructions concerning the spoliation of evidence. The following occurred:
“[Defense counsel]: Judge, there was some requested instructions dealing with spoliation of evidence.
“The Court: Right. Now, most of your instructions were the intentional spoliation of evidence. I really didn’t read any instructions about the, I’ guess you would say, innocent, or negligent mishandling of that.
- “The particular instructions that you presented me in regard to intentional, I’m not going to present. I’ll give you leave if you can find any one charge from a case that deals with something that’s not intentional, I’ll consider giving it.
“[Defense counsel]: All right, sir.”
(R. 3893.) At the end of the jury charges, defense counsel objected to the court’s failure to charge on spoliation of evidence. The court declined to charge the jury on this issue. (R. 4063.)
In Gurley, we stated:
“Depending on the degree of the State’s culpability for the loss of the evidence, the court may decide that the State should be precluded, on retrial, from introducing any evidence relating to the charred object, see Commonwealth v. Olszewski, 401 Mass. 749, 519 N.E.2d 587, 592 (1988), or it may conclude that an ‘adverse inference’ instruction similar to the one given in Youngblood is sufficient to ensure fairness to the appellant, see Thorne v. Department of Public Safety, 774 P.2d 1326, 1331-32 (Alaska 1989); State v. Youngblood, 844 P.2d at 1157; State v. Gonzalez, 206 Conn. 213, 537 A.2d 460, 466 (1988); Tinsley v. Jackson, 771 S.W.2d 331, 332 (Ky.1989).”
639 So.2d at 569.
In State v. Steffes, 500 N.W.2d 608 (N.D.1993), a case relied on in Gurley, the court stated:
“[C]ourts enjoy a large measure of discretion in determining the appropriate sanction that should be imposed because of the destruction of discoverable evidence; and whether the sanction of an adverse-inference instruction would be appropriate is a matter within the sound discretion of the trial court. People v. Morton, 189 A.D.2d 488, 596 N.Y.S.2d 783 (N.Y.App.Div.1993); People v. Miller, 156 Misc.2d 824, 594 N.Y.S.2d 978 (N.Y.Sup.Ct.Crim.Term 1993); People v. Von Villas, 10 Cal.App.4th 201, 13 Cal.Rptr.2d 62 (1992); People v. Wimberly, 5 Cal.App.4th 773, 7 Cal.Rptr.2d 152 (1992). If there is no evidence of bad faith, the sanction imposed by the trial court should be no more than is necessary to assure the defendant a fair trial. Von Villas, supra.”
500 N.W.2d at 614 n. 6.
The circuit court did not err in declining to give the jury an adverse-inference instruction on the loss of the evidence given that there was no evidence of bad faith on the part of the State nor was the missing evidence material to Scott’s defense. Accordingly, we find no error in regard to this claim.
XI.
Scott next argues that the State failed to establish a proper chain of custo *449 dy for an electrical outlet, outlet number 3, that was admitted during Cpt. Thornton’s testimony. He cites Ex parte Holton, 590 So.2d 918 (Ala.1991), in support of his argument. Outlet number 3 was marked and admitted as State’s exhibit number 78.
Cpt. Thornton testified that he was present at the scene when Michael Haynes and Jim Hannah, of the State Fire Marshal’s Office, removed outlet number 3 from the wall of Mason’s bedroom on August 18, 2008. Haynes testified that on the Monday after the fire, August 18, 2012, he and Hannah cut the outlet out in Mason’s bedroom and photographed it from a 360-degree angle. The outlet was put in a bag and left at the scene. Cpt. Thornton testified that the outlets that were removed were cut at different lengths and at different angles so that they would be readily identifiable. When the State’s expert came to the scene, the outlet was retrieved and placed in its original location. Outlet number 3 was in Cpt. Thornton’s custody until May 22, 2009, when it was mailed to one of the defense experts. (R. 1514.) Cpt. Thornton testified that he originally thought that this outlet came from another location in the house but upon closer inspection of the outlet and the numerous photographs he realized that this outlet was taken from one of the outlets cut from Mason’s bedroom. Scott made no objection when this exhibit was admitted into evidence. (R. 1583.)
“The Alabama Supreme Court in Ex parte Holton, 590 So.2d 918 (Ala.1991), addressed the requirements for a chain of custody:
“ ‘Proof of [an] unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. [Ex parte Williams, 548 So.2d 518, 520 (Ala.1989)] In order to establish a proper chain, the State must show to a “reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.” McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988).’
“590 So.2d at 919-20. Later, in Hale v. State, 848 So.2d 224 (Ala.2002), the Supreme Court reexamined its holding in Holton after the 1995 codification of § 12-21-13, Ala.Code 1975. The Supreme Court stated:
‘“Section 12-21-13, Ala.Code 1975, provides:
“ ‘ “Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence.”
“ ‘(Emphasis added.) This statute, by its terms, applies only to “[p]hysical evidence connected with or collected in the investigation of’ the charged crime. To invoke the statute the proponent of the evidence must first establish that the proffered physical evidence is in fact the very evidence “connected with or collected in the investigation.” Moreover,
“ ‘ “[i]n Land v. State, 678 So.2d 201 (Ala.Cr.App.1995), aff'd, 678 So.2d 224 (Ala.1996), a case which appears to rely on § 12-21-13, this court ruled *450 that where a witness can specifically identify the evidence, and its condition is not an issue in the case, then the State is not required to establish a complete chain of custody in order for the evidence to be admitted into evidence. We stated: ‘The eyeglasses were admissible without establishing a chain of custody because [the testifying officer] was able to specifically identify them, and their condition was not an issue in the case.’ Land, 678 So.2d at 210.” ’
“848 So.2d at 228 (emphasis in original).”
Wilson v. State, 142 So.3d 732, 768 (Ala.Crim.App.2012) (opinion on return to remand).
Scott relies on Birge v. State, 973 So.2d 1085 (Ala.Crim.App.2007), to support her assertion that there was reversible error in the State’s failure to establish a proper chain of custody for the outlet. However, Birge involved the chain of custody for a biological sample collected from a victim’s body — not physical evidence collected during the course of an investigation. Biological evidence is not governed by § 12-21-13, Ala.Code 1975, because it is not readily identifiable.
Section 12-21-13, Ala.Code 1975, specifically allows for the admission of outlet number 3 even though there was a weak link in the chain of custody. Outlet number 3 was correctly admitted into evidence pursuant to § 12-21-13, Ala.Code 1975.
XII.
Scott next argues that the State failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he asserts that the State failed to disclose that it intended to intro-' duce outlet number 3 into evidence until the middle of trial and that he was prejudiced by the late disclosure.
Cpt. Thornton testified that outlet number 3 had been in his possession, that he had sent the outlet to the defense expert, that .the outlet was returned to him, that he had until trial believed that the outlet was not from Mason’s bedroom, and that he realized after examining all the numerous photographs that the outlet was in fact outlet number 3 from Mason’s bedroom. After Cpt. Thornton testified, Scott moved to dismiss, the indictment based on the mislabeling of this outlet. The circuit court indicated that it was going to deny the motion and allow the defense expert to examine the outlet before he testified. (R. 1737.) On cross-examination, Lentini tes-tilled that he had an opportunity to examine this outlet when he arrived in town to testify but he did not do so. (R. 3458.)
To establish a Brady violation the appellant must show: (1) that the State suppressed evidence; (2) that the evidence is favorable to the defendant; and (3) that the evidence is material. “In the Brady context, ‘evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.’ ” Barber v. State, 952 So.2d 393, 429 (Ala.Crim.App.2005), quoting in part United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
“Although we do not condone noncompliance with discovery rules, not every violation requires a new trial: ‘Rule 16.5, “gives a trial judge a number of options to consider in imposing sanctions on a party who has failed to comply with the court’s discovery order.” ’ Pettway v. State, 607 So.2d 325, 330 (Ala.Cr.App. 1992) (quoting Clifton v. State, 545 So.2d 173,178 (Ala.Cr.App.1988)).
“ ‘The imposition of sanctions upon noncompliance with a court’s discov *451 ery order is within the sound discretion of the court. United, States v. Koopmans, 757 F.2d 901, 906 (7th Cir.1985); United States v. Saitta, 448 F.2d 830, 831 (5th Cir.1971); Hansen v. United States, 393 F.2d 763, 770 (8th Cir.1968). Moreover, the trial court should not impose, a sanction which is harsher than necessary to accomplish the goals of the discovery rules. United States v. Gee, 695 F.2d 1165, 1169 (9th Cir.1983).’
“McCrory v. State, 505 So.2d 1272, 1279 (Ala.Cr.App.1986).”
Wilson v. State, 777 So.2d 856, 918 (Ala.Crim.App.1999).
The outlet was extensively photographed and documented. One of Scott’s experts was given an opportunity to examine the outlet but failed to do so. Scott’s other' expert, Douglas Carpenter, testified' that he had all the materials he needed in order to give his opinion on the cause of the fire. Both of Scott’s experts testified that the fire originated in the television cabinet and not near or around outlet number 3. The television had been plugged into outlet number 5. Scott cannot establish that the State suppressed evidence, that that evidence was favorable to Scott, or that the evidence was material to Scott’s defense. Accordingly, Scott failed to establish a Brady violation.
XIII.
Scott next argues that the circuit court erred in allowing James Munger to be qualified as an expert in fire science.
The record shows that the State called Munger to testify concerning the origin of the fire. Munger testified that his firm is often retained to do an “origin and cause analysis of a fire,” that since 1984 he has been on the adjunct faculty for the National Fire Academy, that he taught and developed courses in fire prevention and fire investigation, that he had done some instructional work for the Alabama Fire College, that from 1980 through 1985 he was a deputy fire marshal in Montgomery and was responsible for 11 counties, that prior to becoming a fire marshal he had been a firefighter in the City of Cullman for three years, that he had taken specialty classes from the National Fire Academy, that he had attended seminars in fire investigation, that he has attended numerous classes sponsored by the National Fire Academy, that he had attended training seminars sponsored by the Department of Homeland Security, that he had attended classes sponsored by the International Association of Arson Investigators, that his doctoral dissertation was on residential smoke alarms, that he is member of the National Fire Protection Association and the Society of Fire Protection Engineers, that he had been qualified as expert in fire protection or fire causes in several hundred cases, that he had received various professional awards for his work, that he had published articles on the subject of fire prevention and investigation, and that he had been certified as an expert by the Alabama Supreme Court. The State moved that Munger be qualified as an expert. Scott objected and requested that she be allowed to voir dire Munger. (R. 2562.) An extensive voir dire took place at which time Scott questioned Munger concerning his lack of a four-year college degree and having an associate degree from what she characterized as a diploma mill. The circuit court held that based on the Supreme Court’s opinion in Carruth v. Pittway Corp, 643 So.2d 1340 (Ala.1994), Munger was a qualified expert in “fire science and technology” and that Scott could attack Munger’s credentials on cross-examination. (R. 2588.)
In Carruth, the Alabama Supreme Court considered the validity of thé circuit *452 court’s grant of Pittwa/s summary-judgment motion after the court failed to state whether it considered Munger’s testimony. On appeal, Pittway argued that Munger’s testimony should not have been considered because Munger lacked a four-year college degree, because he was not an engineer, and because he was not a proper expert. After detailing Munger’s qualifications, the Supreme Court stated: “[W]e a^e persuaded that Munger possessed the qualifications to testify as an expert in matters of fire science and technology.” 643 So.2d at 1343.
Rule 702, Ala. R. Evid., provides:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
“As under preexisting Alabama law, both questions — whether a witness is qualified as an expert and whether, if so qualified, that witness may give expert opinion testimony on the subject in question — are left largely to the discretion of the trial judge.” Advisory Committee’s Notes to Rule 702, Ala. R. Evid.
“[U]nder Rule 702 ‘qualification’ should continue to be defined broadly, so that one may gain an expertise through practical experience as well as through formal training or education. See, e.g., International Telecommunications Sys. v. State, 359 So.2d 364 (Ala.1978) (recognizing that experience and practical knowledge, as fully as formal education, qualify one to make technical judgments).”
Advisory Committee’s Notes, Rule 702, Ala. R. Evid.
“Alabama courts have recognized that an individual might qualify as an expert based on ‘study, practice, experience, or observation.’ In addition, the fact that a witness has previously testified as an expert may be relevant in determining his qualifications. Not one of these qualities has been exalted over the others, and it has been said that ‘[experience and practical knowledge may qualify one to make technical judgments as readily as formal education.” ’
William A. Schroeder and Jerome A. Hoffman, Alabama Evidence § 7:17 (3d ed.2006). See also Cherry v. Audubon Ins. Co., 51 So.3d 109, 113 (La.App.2010) (“Formal education is ‘not always necessary’ and experience may be sufficient.”); In re C.W.D., 232 Ga.App. 200, 206, 501 S.E.2d 232, 239 (1998) (“Formal education or training in an area of expertise is not necessary, provided the witness possesses the qualifications of such area of expertise through skill and experience.”); Williams v. State, 239 Ga.App. 30, 32, 521 S.E.2d 27, 30 (1999) (“Also, an expert’s credentials are relevant to the weight and credit to be given to his testimony by the jury.”); Khairkhwa v. Obama, 793 F.Supp.2d 1, 11 (D.D.C.2011) (“There is ... no requirement that an expert possess formal education, and an expert may be qualified on the basis of his or her practical experience.”); State v. Hollingsworth, 160 Wis.2d 883, 896, 467 N.W.2d 555, 560 (1991) (“A person may be an ‘expert’ under [W.S.A. Rule 907.02, similar to Rule 702, Ala. R. Evid.] based on experience alone and need not have any special education or training.”). “A combination of specialized training, work experience and practical application of the expert’s knowledge can combine to establish that person as an expert.... Courts can also consider whether a witness has previously been qualified as an expert.” State v. Marlowe, 81 So.3d 944, 970 (La.Ct.App.2011).
*453 The circuit court did not abuse its considerable discretion in determining that Munger was an expert in the field of fire science based on his extensive qualifications and the Supreme Court’s opinion in Carruth.
XIV.
Scott next asserts that the prosecutor made improper victim-impact statements in his closing arguments in the guilt phase of Scott’s trial that were immaterial to any issue of guilt and that amounted to error.
When evaluating prosecuto-rial arguments, we keep in mind the following:
“ ‘The relevant question is whether the prosecutor’s comments “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert, denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).”
Simmons v. State, 797 So.2d 1134, 1162 (Ala.Crim.App.1999). “A prosecutor may argue every legitimate inference from the evidence ‘and may examine* collate, [sift] and treat the evidence in his own way.” ’ Woodward v. State, 123 So.3d 989, 1028 (Ala.Crim.App.2011). Specifically, Scott challenges the following arguments.
A.
Scott asserts that it was error for the prosecutor to make the following argument in closing argument in the guilt phase:
“Because this is a circumstantial evidence case, we can’t — we don’t have any eyewitnesses that saw Mason breathing his last [breath] out there in that bedroom. We don’t have any eyewitnesses that can show you how much pain he went through and what kind of horror he went through as he was leaned up against that bedpost and that fire in that room and that smoke and those gases. We can’t show you that.”
(R. 3922.) Scott did not object to this argument; therefore, we review this claim for plain error. See Rule 45A, Ala. R.App. P. “While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejtidice.” Ex parte Kennedy, 472 So.2d 1106, 1111 (Ala.1985).
“ ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ ” Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000). “A prosecutor may argue every legitimate inference from the evidence ‘and may examine, collate, [sift] and treat the evidence in his own way.’ ” Woodward v. State, 123 So.3d 989, 1078 (Ala.Crim.App. 2011), “[Statement of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.” Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989).
The prosecutor’s argument was a legitimate inference that could have been drawn from the evidence and did not so infect the trial with unfairness that Scott was denied due process. See Darden v. Wainwnght, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
*454 B.
Scott, next challenges the following remarks made by the prosecutor in closing argument in the guilt phase of her trial:
“[Prosecutor]: One thing I don’t want you to lose focus on in this case, it’s what this case is really about, is that right there (indicating). Mason Scott, six years old the time of his death. He’s never going to play ball again—
“[Defense counsel]: Objection. Improper victim impact.
“The Court: Overruled.
“[Prosecutor]: He’s never going to get married, he’s never going to go to school—
“[Defense counsel]: ' Objection. Improper victim impact.
“The Court: Overruled.
“[Prosecutor]: The loved ones, his family will never see him again—
“[Defense counsel]: Objection. Improper victim impact.
“The Court: Overruled.”
(R. 4034-85.)
In addressing a similar argument, the North Carolina Supreme Court found no error and stated:
“Although the prosecutor’s arguments that the victim might have married and had children was speculative, it was not excessive. The life the prosecutor posited for the victim if she had lived was a conventional, one. Even assuming ar-guendo that this part of the argument was improper, we do not believe that the trial court abused its judgment in overruling defendant’s objection.”
State v. Berry, 356 N.C. 490, 519, 573 S.E.2d 132, 151 (2002). State v. Edwards, 116 S.W.3d 511, 538 (Mo.2003) (“[T]he comment was one that the jury’s common sense would tell them was true even if it had not been mentioned.”). See also Kenneth J. Rampino, J.D., Propriety and Prejudicial Effect of Prosecutor’s Remarks as to Victim’s Age, Family Circumstances, or the Like, 50 A.L.R.3d 8 (1973).
The jury was instructed that arguments of counsel were not evidence. Neither of the prosecutor’s arguments so infected the trial with unfairness that Scott was denied due process. The prosecutor’s arguments did not constitute error.
XV.
Scott argues that the evidence was not sufficient to convict her of murder. Specifically, she argues that there was no evidence that she intentionally started or caused a fire and that she intended to kill Mason.
Scott was charged with three counts of capital murder. Count I charged that Scott murdered her son Mason for pecuniary gain; Count II charged that Scott murdered Mason during the course of an arson; and Count III charged that Scott murdered Mason, a child under the age of 14. Scott was convicted on all counts.
Murder for purposes of the capital-murder statute is defined in § 13A-6-2, Ala. Code 1975:
“(a) A person commits the crime of murder if he or she does any of the following:
“(1) With intent to cause the death of another person, he or she causes the death of that person or of another person. ...”
Section 13A-7-41, Ala.Code 1975, defines the crime of arson in the first degree:
“(a) A person commits the crime of arson in the first degree if he intentionally damages a building by starting or maintaining a fire or causing an explosion, and when:
*455 “(1) Another person is present in such building at the time .... ”
In addressing the sufficiency of the evidence to sustain a conviction, the Alabama Supreme Court has stated:
“ ‘In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985).’ Powe v. State, 597 So.2d 721, 724 (Ala.1991). It is not the function of this Court to decide whether the evidence is believable beyond a reasonable doubt, Pennington v. State, 421 So.2d 1361 (Ala.Crim.App.1982); rather, the function of this Court is to determine whether there is legal evidence from which a rational finder of fact could have, by fair inference, found the defendant guilty beyond a reasonable doubt. Davis v. State, 598 So.2d 1054 (Ala.Crim.App.1992). Thus, ‘[t]he role of appellate courts is not to say what the facts are. [Their role] is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.’ Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978) (emphasis original).”
Ex parte Tiller, 796 So.2d 310, 312 (Ala.2001).
“In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt! Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State. A verdict of conviction will not be set aside on the ground of insufficiency of the evidence unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust. Duncan v. State, 436 So.2d 883 (Ala.Cr.App.1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984); Johnson v. State, 378 So.2d 1164 (Ala.Cr.App.), cert. quashed, 378 So.2d 1173 (Ala.1979).”
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
“Whenever the sufficiency of evidence is in question, the evidence must be reviewed in the light most favorable to the State. Any conflicting evidence presents a jury question that is not subject to review on appeal so long as the *456 State’s evidence establishes a prima fa-cie case, an appellate court must accept as true the evidence introduced by the State, accord the State all legitimate inferences from that evidence, and consider the evidence in the light most favorable to the State. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).”
Carden v. State, 621 So.2d 342, 347 (Ala.Crim.App.1992).
“ ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’ White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in no way considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’ Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985).”
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989).
“[I]ntent is a question for the jury.... ‘Intent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’ Pmnphrey v. State, 156 Ala. 103, 47 So. 156, 157 (1908).”
McCord v. State, 501 So.2d 520, 528-29 (Ala.Crim.App.1986).
“ ‘Whether circumstantial evidence tending to connect the defendant with the crime excludes, to a moral certainty, every other reasonable hypothesis than that of the defendant’s guilt is a question for the jury and not the court.’ Cumbo [v. State, 368 So.2d 871 (Ala.Crim.App.1978)]; Cannon v. State, 17 Ala.App. 82, 81 So. 860 (1919). Our function is not to be factfinders, however tempting that may sometimes be. We must not substitute ourselves for jurors, nor play their role in the criminal process.”
Linzy v. State, 455 So.2d 260, 262 (Ala.Crim.App.1984).
 In discussing the sufficiency of the evidence as it relates to arson cases, we have stated:
“In order to establish the corpus delicti of arson, burning by natural or accidental causes must also be satisfactorily excluded. C.L.M., Jr. v. State, 531 So.2d 699 (Ala.Crim.App.1988). The corpus delicti of the offense of arson may be established by inference, see Bolden v. State, 568 So.2d 841 (Ala.Crim.App.1989), and by circumstantial evidence. Bolden; Smiley v. State, 376 So.2d 813 (Ala.Crim.App.1979).”
McCostlin v. State, 594 So.2d 214, 218 (Ala.Crim.App.1991).
“In arson cases, the trier of fact usually draws inferences from circumstantial evidence:
“[TJhere is rarely direct evidence of the actual lighting of a fire by an arsonist; rather, the evidence of arson is usually circumstantial. Such evidence is often of a negative character; that is, the criminal agency is shown by the absence of circumstances, conditions, and surroundings indicating that the fire resulted from an accidental cause. [Fox v. State, 179 Ind.App. 267, 277, 384 N.E.2d 1159 (1979).]”
People v. Nowack, 462 Mich. 392, 403, 614 N.W.2d 78, 83 (2000). ‘“[T]he crime of arson is, by its very nature, secretive and usually incapable of direct proof.’ ” People v. Smith, 253 Ill.App.3d 443, 449, 191 Ill. *457 Dec. 648, 653, 624 N.E.2d 836, 841 (1993), quoting People v. Smith, 44 Ill.App.3d 237, 241, 2 Ill.Dec. 877, 357 N.E.2d 1320 (1976).
“[T]he evidence focused on four circumstantial elements ■ of guilt: presence at the scene, conduct before and after the fire, proof that the fire was intentionally set, and motive. Although standing alone, evidence of motive, presence, or opportunity is insufficient to prove guilt, McGowan v. State, 671 N.E.2d 1210, 1214 (Ind.Ct.App.1996), here the evidence, taken together, was sufficient to link [the appellant] with the fire. It is well within the jury’s province to disbelieve [the appellant’s] version of the events.”
Belser v. State, 727 N.E.2d 457, 465 (Ind.App.2000).
The facts, as set out extensively in the beginning of this opinion, were sufficient to present the issue of Scott’s guilt to the jury for its consideration. There was sufficient circumstantial evidence from which to conclude that Scott was guilty of murdering Mason during the course of an arson and for pecuniary gain. There is no reason to disturb the jury’s verdict in this case.
XVI.

Penalty-Phase Issues

Scott argues that the circuit court’s jury instructions in the penalty phase were erroneous. He makes two separate arguments in support of this claim. We note:
“A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘ “the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.” ’ Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999). “When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.” Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).
A.
First, Scott asserts that the circuit court erred in failing to instruct the jury that the death penalty is never a required punishment.
After the trial court instructed the jury in the penalty phase, Scott objected, stating that the court failed to give her requested instruction that the death penalty was never a required punishment. The court declined to give this instruction. (R. 4256.)
The Florida Supreme Court has addressed a similar issue:
“Among the proposed jury instructions requested by Partin was an instruction to the jury that it was ‘never required to recommend a sentence of death.’ ‘[F]ailure to give special jury instructions does not constitute error where the instructions given adequately address the applicable legal standards.’ Coday v. State, 946 So.2d 988, 994 (Fla.2006) (quoting Stephens v. State, 787 So.2d 747, 755 (Fla.2001)). A trial court’s denial of special jury instructions is reviewed for abuse of discretion. See Hudson v. State, 992 So.2d 96, 112 (Fla.2008).
“Here, the trial court provided standard instructions repeatedly approved *458 by this Court as an adequate description on the role of the penalty-phase jury. See Phillips v. State, 39 So.3d 296, 304 (Fla.), cert. denied, 562 U.S. 1010, 131 S.Ct. 520, 178 L.Ed.2d 384 (2010). And in any event, the trial court did not abuse its discretion in rejecting Partin’s request because his requested instruc-' tion was more stringent than required under applicable case law. See In re Std. Jury Instr. in Crim. Cases-Report No. 2005-2, 22 So.3d 17, 22 (Fla.2009) (rejecting a proposed amendment stating that the jury is ‘never required to recommend a sentence of death’ in favor of ‘less stringent’ language consistent with ‘our state and federal case law in this area’).”
Partin v. State, 82 So.3d 31, 44 (Fla.2011).
The circuit court’s instructions on weighing the mitigating circumstances and the aggravating circumstances were consistent with Alabama law. Indeed, we have frequently held that a court does not err in instructing the jury that it should “avoid the influence of any passion, prejudice, or any other arbitrary factor.” Vanpelt v. State, 74 So.3d 32, 93 (Ala.Crim.App.2009). Thus, the requested instruction was more stringent than Alabama law. The circuit court did not abuse its discretion in denying Scott’s request to instruct the jury that it was never required to recommend a sentence of death.
B.
Scott next argues that the court’s instructions erroneously allowed the jury to believe that it could not consider a mitigating circumstances unless the entire jury agreed upon its existence. Scott cites Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), to support her argument.
At the conclusion of the court’s instructions, Scott did not object to the court’s failure to charge the jury on the agreement necessary to find the existence of mitigating circumstances. Accordingly, we review this claim for plain error. See Rule 45A, Ala. R.App. P.
“ ‘Mills [v. Maryland, 486 U.S. 367 (1988)] requires that each juror be permitted to consider and give effect to ... all mitigating evidence in deciding ... whether aggravating circumstances outweigh mitigating circumstances... ’ ” McKoy v. North Carolina, 494 U.S. 433, 442-43, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). This Court has stated the following when addressing a Mills claim:
“The appellate courts of this state have consistently held, since the United States Supreme Court’s decision in Mills [v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)], that as long as there is no ‘reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances,’ there is no error in the trial court’s instruction on mitigating circumstances. Freeman [v. State], 776 So.2d [160] at 195 [ (Ala.Crim.App.1999)]. See also Ex parte Martin, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Brown v. State, 686 So.2d 385 (Ala.Cr.App.1995); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994).”
*459 Tyson v. State, 784 So.2d 328, 351 (Ala.Crim.App.2000).
More recently, the United States Supreme Court revisited Mills in Smith v. Spisak, 558 U.S. 139, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010), and stated:
“[T]he instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously. Neither the instructions nor the forms said anything about how — or even whether — the jury should make individual determinations that each particular mitigating circumstance existed. They focused only on the overall balancing question. And the instructions repeatedly told the jury to ‘conside[r] all of the relevant evidence.’ ... In our view the instructions and verdict forms did not clearly bring about, either through what they said or what they implied, the circumstance that Mills found critical, namely,
“ ‘a substantial possibility that reasonable jurors, upon receiving the judge’s instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.’ 4§6 U.S., at 384.”
558 U.S. at 148, 130 S.Ct. at 684.
The instructions, taken as a whole, did not imply that the jurors had to unanimously agree on a mitigating circumstance before finding that a mitigating circumstance was present. “We have considered the trial court’s charge to the jury in light of the holding in Mills and are of the opinion that the jurors could not have reasonably believed that they were required to agree unanimously on the existence of any particular mitigating factor.” Ex parte Martin, 548 So.2d 496, 499 (Ala.1989). Accordingly, we find no error.
XVII.
Scott next argues that the United States Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires that her death sentence be vacated. She asserts: “While acknowledging Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), Scott maintains that Ring invalidates critical aspects of Alabama’s capital sentencing scheme and renders her death sentence unconstitutional” (Scott’s brief at p. 123.), and that Waldrop “undermines the reliability of the capital sentencing process.” (Scott’s brief at p. 125.)
Scott was convicted of capital murder for committing an intentional murder for pecuniary gain. Committing an intentional murder for pecuniary gain is an aggravating circumstance defined in § 13A-5-49(6), Ala.Code 1975. As the Alabama Supreme Court stated:
“ ‘[W]hen a defendant is found guilty of •a capital offense, “any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.” Ala.Code 1975, § 13A-5-45(e).... ’
“Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree,,a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was ‘proven beyond a reasonable doubt.’ Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to *460 impose a sentence of death. Ala.Code 1975, § 13A-5^5(f). Thus, in Wal-drop’s case, the jury, and not the trial judge, determined the existence of the ‘aggravating circumstance necessary for imposition of the death penalty.’ Ring [v. Arizona], 536 U.S. [584,] 609, 122 S.Ct. [2428,] 2443 [(2002)]. Therefore, the findings reflected in the jury’s verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),] require.”
Ex parte Waldrop, 859 So.2d at 1188.
“Ring and Apprendi do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in ‘an increase in a defendant’s authorized punishment ... ’ or ‘ “expose[ ] [a defendant] to a greater punishment....’” Ring, 536 U.S. at 602, 604, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348.) Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death.”
Waldrop, 859 So.2d at 1190.
Scott further argues, in this section of her brief, that Alabama’s judicial override is standardless and unconstitutional. However, this Court on numerous occasions has upheld that statute against similar attacks.
“The appellant further contends that, in light of Ring [v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)], Alabama’s standardless override results in the arbitrary application of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and the Equal Protection Clause. ‘The United States Supreme Court in Ring did not invalidate its earlier holding in Hams v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), which upheld § 13A-5-47(e), Ala.Code 1975 — commonly referred to as the judicial-override statute — against constitutional attack.’ Tomlin v. State, 909 So.2d 213, 282 (Ala.Crim.App.2002), rev’d on other grounds, 909 So.2d 283 (Ala.2003). Therefore, the appellant’s argument is without merit.”
Sneed v. State, 1 So.3d 104, 143-44 (Ala.Crim.App.2007). See also Woodward v. State, 123 So.3d 989 (Ala.Crim.App.2011); Stanley v. State, 143 So.3d 230 (Ala.Crim.App.2011); Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010); Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004). Scott’s argument is without merit.
XVIII.
Scott next argues that the prosecution misled the jury by referring to the jury’s verdict in the penalty phase as a recommendation. This Court has repeatedly held that a trial court does not commit reversible error in referring to the jury’s verdict in the penalty phase as a recommendation.
“After reviewing the record in its entirety, as well as the context in which the allegedly inappropriate comments were made, we find that ‘there is “no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing under Alabama law.” ’ Price [v. State, 725 So.2d 1003, 1027 (Ala.Crim.App.1997) ], quoting Taylor v. State, 666 So.2d 36, 51 (Ala.Cr.App.1994). ‘The prosecutor’s comments and the trial court’s instructions “accurately informed the jury of its sentencing authority and in no way minimized the jury’s role and responsibility in sentencing.” ’ Weaver v. State, 678 So.2d 260, 283 (Ala.Cr.App.1995), rev’d *461 on unrelated grounds, 678 So.2d 284 (Ala.1996).”
Hagood v. State, 111 So.2d 162, 203 (Ala.Crim.App.1998). Accordingly, Scott is due no relief on this claim.
XIX.
Scott argues that double-counting the aggravating circumstance that the murder was committed for pecuniary gain' as both as an aggravating circumstance and as an element of the capital-murder offense violates her rights to due process and to a fair and impartial jury.
“Contrary to Vanpelt’s assertions, there is no constitutional or statutory prohibition against double counting certain circumstances as both an element of the offense and an aggravating circumstance. See § 13A-5-45(e), Ala.Code 1975 (providing that ‘any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing’). The United States Supreme Court, the Alabama Supreme Court, and this court have all upheld the practice of double counting. See Lowenfield v. Phelps, 484 U.S. 231, 241-46, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (‘The fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm.’); Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (‘The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both).’); Ex parte Kennedy, 472 So.2d 1106, 1108 (Ala.1985) (rejecting a constitutional challenge to double counting); Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007); Harris v. State, 2 So.3d 880 (Ala.Crim.App.2007); Jones v. State, 946 So.2d 903, 928 (Ala.Crim.App.2006); Peraita v. State, 897 So.2d 1161, 1220-21 (Ala.Crim.App.2003); Coral v. State, 628 So.2d 954 (Ala.Crim.App.1992); Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991). Because double counting is constitutionally permitted and statutorily required, Vanpelt is not entitled to any relief on this issue. § 13A-5-45(e), Ala.Code 1975.”
Vanpelt, 74 So.3d at 89. See also McCray v. State, 88 So.3d 1 (Ala.Crim.App.2010); Mitchell v. State, 84 So.3d 968 (Ala.Crim.App.2010); James v. State, 61 So.3d 357 (Ala.Crim.App.2010). This issue has no merit.
XX.
Scott next argues that evolving standards of decency have rendered Alabama’s method of execution — lethal injection — unconstitutional. Scott does not argue that Alabama’s method of execution is unconstitutional because it is cruel and unusual.
The Alabama Supreme Court addressed this issue in Ex parte Belisle, 11 So.3d 323 (Ala.2008), and held:
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520] 1538 [170 L.Ed.2d 420 (2008)], and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, [553 U.S. at 61], 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the, main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, [553 U.S. at 114], 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices *462 recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, [553 U.S. at 121], 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusu- ■ al.’ Baze, [553 U.S. at 50], 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
11 So.3d at 339. See also McCray, supra; Phillips v. State, 65 So.3d 971 (Ala.Crim.App.2010). Other states have also considered this issue since the United States Supreme Court’s decision in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). See State v. Hester, 324 S.W.3d 1, 80 (Tenn.2010) (“[W]e find that Mr. Hester has not offered a persuasive argument for revisiting this Court’s previous decisions upholding the constitutionality of Tennessee’s lethal injection protocol.”); Henyard v. State, 992 So.2d 120, 130 (Fla.2008) (“We have previously concluded in Lightbourne [v. McCollum, 969 So.2d 326 (Fla.2007),] and Schwab [v. State, 969 So.2d 318 (Fla.2007),] that the Florida protocols do not violate any of the possible standards, and that holding cannot conflict with the narrow holding in Baze.”); Goff v. State, 14 So.3d 625, 665 (Miss.2009) (“Goffs claim that Mississippi method of inflicting death by lethal injection constitutes cruel and unusual punishment was dispositively rejected in favor of the State by the United States Supreme Court’s holding in Baze v. Rees and by this Court’s holding in Bennett v. State [, 990 So.2d 155 (Miss.2008) ].”); O’Kelley v. State, 284 Ga. 758, 770, 670 S.E.2d 388, 399 (2008) (“[W]e conclude that O’Kelley failed to meet the standard as enunciated by the-United States Supreme Court for finding a state’s lethal injection procedures cruel and unusual, in that he has not demonstrated that Georgia’s procedures create ‘ “a substantial risk of serious harm.” ’ ”).
The Alabama Supreme Court in Ex parte Belisle held that Alabama’s method of imposing death by lethal injection, a three-drug protocol, did not violate the Eighth Amendment to the United States Constitution. This Court is bound by the decisions of the Alabama Supreme Court. See 12-3-16, Ala.Code 1975. Scott cites no new evidence or argument that distinguishes this case from Ex parte Belisle. Accordingly, Scott’s argument is without merit.
XXI.
Scott argues that the trial court erred in overriding the jury’s recommendation of life imprisonment without the possibility of parole and sentencing her to death. Seven members of the jury, the minimum required by law, voted to impose a sentence of life imprisonment without the possibility of parole and five voted to impose the death sentence. See 13A-5-46(f), Ala. Code 1975.[4] Specifically, Scott argues that *463 the compelling mitigation evidence that was presented from over 20 friends and family members warranted, a sentence of life imprisonment without the possibility of parole and that the court’s override of the jury’s recommendation violates the Alabama Supreme Court’s decisions in Ex parte Taylor, 808 So.2d 1215 (Ala.2001), and Ex parte Carroll, 852 So.2d 838 (Ala.2002).
Section 13A-5-47(e), Ala.Code 1975, grants the sentencing judge exclusive authority to fix the sentence for a capital-murder conviction. This section provides:
“In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict, unless such a verdict has been waived pursuant to Section 13A-5-46(a) or Section 13A-5-46(g). While the jury’s recommendation concerning sentence shall be given consideration, it is not binding upon the court.”
In Ex parte Taylor, 808 So.2d 1215 (Ala.2001), the Alabama Supreme Court considered the scope of § 13A-5-47(e), Ala.Code 1975, when it evaluated the legality of Taylor’s death sentence after the jury recommended, by a vote of 7 to 5, that Taylor be sentenced to life imprisonment without the possibility of parole. In upholding Taylor’s death sentence, the^ Alabama Supreme Court stated:
“In this ease, the trial judge stated that ‘[t]he sentence recommendation of a properly functioning jury is entitled to great respect.’ He reasoned, however, that ‘[wjhile the jurors in this case were cooperative, harmonious, diligent, and attentive, some jurors’ outbursts of emotion after they found the defendant guilty of capital murder indicated that they were overwhelmed by their impending duty to consider the death penalty as required by law.’ The trial judge then concluded that the crimes proved against Taylor were ‘abominably aggravated and, at best, only faintly mitigated.’ Thus, the trial judge considered the jury’s recommendation, as required by Alabama’s death-penalty statute, but permissibly assessed it very little weight, given the particular circumstances of this case. Therefore, we agree with the conclusion of the Court of Criminal Appeals .that ‘the trial court complied with the sentencing scheme of Alabama’s death-penalty statute and that the sentence it imposed, overriding the jury’s recommendation, met constitutional requirements and was not arbitrary, discriminatory, or. fundamentally unfair.’ Taylor v. State, 808 So.2d [1148] at 1190 [ (Ala.Crim.App.2000)q].”
808 So.2d at 1219. Ex parte Taylor was the first case to hold that when a circuit judge chooses to override a jury’s recommendation of life imprisonment without the possibility of parole, the judge must set out specific reasons for giving the jury’s recommendation the consideration that it did.
The next year in Ex parte Carroll, the Alabama Supreme Court considered the validity of a death sentence after the jury had recommended, by a vote of 10 to 2, life imprisonment without the possibility of parole. The Supreme Court found that Carroll’s lack of a significant criminal history, the victim’s family’s requests to spare Carroll’s life, and the jury’s 10 to 2 recommendation “tip[ped] the scales in favor” of a sentence of life imprisonment. The Supreme Court stated the following concern *464 ing the scope of § 13A-5-47(e), Ala.Code 1975:
“We take this opportunity to further explain the effect of a jury’s recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the ‘triggerman’ or a recommendation of leniency by the victim’s family; the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.
[[Image here]]
“ ‘Given the jury’s recommendation of life imprisonment without parole; the recommendation of the victim’s family that the defendant be sentenced to life imprisonment without parole; the fact that the defendant was 17 years old when he committed the crime; and the circumstances of the crime (particularly that the defendant made no attempt to kill the witnesses to the crime), ... the sentence of death is excessive and disproportionate.”
“852 So.2d at 828 (Houston, J., concurring in part and dissenting in part). Because of Carroll’s age at the time of the offense, his lack of a significant criminal history, and the recommendation of the victim’s family that he be sentenced to life imprisonment without parole, the jury’s 10-2 recommendation that he not be sentenced to death tips the scales in favor of following the jury’s recommendation. We therefore reverse the judgment of the Court of Criminal Appeals as to Carroll’s sentence and remand the case for that court to instruct the trial court to resentence Carroll following the jury’s recommendation of life imprisonment without the possibility of parole.”
852 So.2d at 836-37.
Later, in Ex parte Tomlin, 909 So.2d 283 (Ala.2003), the jury unanimously recommended that Tomlin be sentenced to life imprisonment without the possibility of parole and the court’s only explanation for overriding its recommendation was that Tomlin’s codefendant had been convicted of capital murder and sentenced to death. The Alabama Supreme Court, in setting aside the death sentence, stated:
“ ‘[T]he death penalty should be carried out only after this Court has found it appropriate to do so by independently weighing the aggravating and mitigating circumstances.’ Ex parte Hays, 518 So.2d 768, 780 (Ala.1986) (opinion on rehearing). Therefore, while the trial court, acting without the guidance offered by Carroll, gave ‘serious consideration to the unanimous recommendation of the jury for life [imprisonment] without parole,’ we are compelled to treat the jury’s recommendation as a mitigating circumstance. Indeed, we must give that mitigating circumstance great weight.
“ ‘The weight to be given [a jury’s recommendation of life imprisonment without the possibility of parole] should depend upon the number of jurors recommending a sentence of life imprisonment without parole.’ [Ex parte ] Carroll, 852 So.2d [833] at 836 [(Ala.2002)]. In Carroll, we found that a jury’s 10-2 vote for a sentence of life imprisonment without the possibility of parole demon *465 strated ‘overwhelming support’ of such a sentence. 852 So.2d at 837. Therefore, it is only logical to conclude that a unanimous recommendation like the one here provides even more ‘overwhelming support’ of such a sentence and, therefore, must be afforded great weight.
[[Image here]]
“ ‘[T]he jury’s recommendation [of life imprisonment without the possibility of parole] may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.’ Carroll, 852 So.2d at 836. Here, the trial court overrode the jury’s recommendation, because ‘[t]he other perpetrator in this crime, John Ronald Daniels, was convicted of the capital offense of first degree murder of the same two people and [was] sentenced to death.’ Although the jury was not aware of Daniels’s sentence, his sentence cannot properly be used to undermine a mitigating circumstance.”
909 So.2d at 286-87.
The circuit court’s order sentencing Scott to death, states, in part:
“The final non-statutory mitigating factor is the jury’s recommendation of life without parole. It is clear to the Court that excluding this final mitigating factor of the jury’s recommendation, the aggravating factors clearly outweigh the mitigating factors. The Court will now discuss the jury’s recommendation as a mitigating factor. Ex parte Carroll, 852 So.2d 833 (Ala.2002), outlines as factors in determining whether to override a jury’s recommendation.
“Ex parte Carroll sets out that the weight to be given the mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole. In Carroll, then jurors recommended life without parole. In the present case, seven made such a recommendation, the statutory minimum to allow a life' without parole recommendation. To override the jury’s recommendation, Ex parte Carroll directs the trial court to try to discern why the jury made their recommendation.
“The jury found [Scott] guilty of three counts of capital murder. In other words, this particular murder fit the definition of three different ways the Alabama legislature has set out to be bad enough to justify capital murder. That is a powerful statement. Not only did [Scott] commit the capital murder making her eligible for the death penalty, but three different elements were proven to make her eligible for the death penalty three different ways.
“The States’s case was based on circumstantial evidence. The jury may have taken that into consideration in its recommendation. The Court has tried cases involving - circumstantial evidence, cases based on confessions, and cases involving direct eyewitness testimony. This Court has no doubt of [Scott’s] guilt after listening to all the evidence. Residual doubt is not a factor that should be used in the sentencing portion of the case; however, the jury may have considered this. The Court would not use residual doubt in its consideration, but that being stated, this Court has no residual doubt as to [Scott’s] guilt.

“The jury also heard very emotional testimony from [Scott’s] family asking that her life be spared. The jury had already spent over four weeks hearing testimony in this case. The jury was probably emotionally and mentally worn out. The jury may have given too much weight to the mitigating factor of 
*466
the emotional testimony of family and friends of [Scott].

“In the same vein, most juries hear emotional testimony from the victim’s family in a capital murder case. In this case there was no one there to take that position. [Scott’s] family is also the family of the victim. Testimony indicates that they feel [Scott] is not guilty. The Court understands and sympathizes with their position, but it deprives the jury of hearing testimony from someone willing to stand up for the victim.

“The jury is also asked to view this capital murder with other capital murders and determine whether it is more heinous, atrocious, and cruel than other capital murders. The jury does this without having specific knowledge of any other capital-murder cases. The Court, however, has the ability to learn of other capital-murder cases where the Court ordered the death of the defendant. This Court is convinced that other defendants have been sentenced to death for murders that are less heinous, atrocious and cruel than this murder. In particular, this Court followed the jury’s recommendation of death in the case of Jodey Waldrop, where the facts were less heinous, atrocious, and cruel than the facts of this case. The jury in this case is not privy to the information in the other cases, and this may lead to less emphasis on this aggravating factor.

“The process of rejecting a jury’s recommended sentence is not an undertaking that most trial judges relish. However, under Alabama’s law the trial judge is required to accept this responsibility. In Harris v. Alabama, 513 U.S. 504[, 515] (1995), the Supreme Court of the United States held: ‘The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury’s recommendation and trusts the judge to give it the proper weight.’ The Alabama Legislature has embraced this position and it has accordingly placed the weight of this decision squarely in the hands of this Court.
“The law requires this Court to weigh the aggravating circumstances against the mitigating circumstances, which includes the jury’s recommended sentence of life without parole.
“The Court has weighed the aggravating circumstances against the mitigating circumstances. Heavy weight is placed on the jury’s recommendation.
“The Court is a great believer in the jury system and following the jury when at all possible. Killing your own child for money by burning him alive is too much to overcome. Even with the jury’s recommendation, the aggravating factors clearly outweigh the mitigating factors. Justice must be served. The only way justice can be served in this case is by a sentence of death.”
(C.R.10-12) (emphasis added).
Scott specifically challenges the emphasized portion of the circuit court’s sentencing order. We will address each of her arguments.
A.
Scott first argues that the circuit court violated the Supreme Court’s holding in Carroll by disregarding the wishes of the victim’s family and, in fact, using the victim’s family’s wishes to support a death sentence. Scott specifically challenges the second paragraph emphasized in the circuit court’s sentencing order.
The Carroll Court stated the following concerning the relevance of the wishes of the victim’s family:
*467 “[I]n light of the wish of the victim’s family that Carroll be sentenced to life imprisonment -without parole rather than, sentenced to death, evidence that was admitted without objection, we find it hard to reconcile the trial court’s reliance upon the ‘pain of the victim’s family’ as one of its reasons for overriding the juryes recommendation.
[[Image here]]
“We take this opportunity to further explain the effect of a jury’s recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength’of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the ‘triggerman’ or a recommendation of leniency by the victim’s family; the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.”
852 So.2d at 886.
Unlike the circumstances presented in Carroll, in this case, the victim and Scott were members of the same family. The sentencing judge had ,the opportunity to view the family members as they testified in the penalty phase — an opportunity that this Court lacks — and he specifically found that the family members believed that Scott was innocent of the charges. We cannot find error in the circuit court’s assignment of little weight to the victims’s family’s wishes given that they disagreed with the jury’s finding of guilt and that they were also Scott’s family. Indeed, we have held that “the opinion of the friends or relatives of the defendant that the defendant should not be sentenced to death is not a relevant mitigating circumstances. for the jury to consider at the penalty phase of a capital case.” Taylor v. State, 666 So.2d 36, 58 (Ala.Crim.App.1994). See also Woods v. State, 13 So.3d 1, 33 (Ala.Crim.App.2007). Annot., Propriety of Imposition of Death Sentence by State Court Following Jury’s Recommendation of Life Imprisonment or Lesser Sentence, 8 A.L.R.4th 1028 (1981).
Given the facts presented in this case, the circuit court’s failure to give the victim’s family members wishes great weight does not conflict with the Supreme Court’s decision in Carroll.
B.
Scott further argues that the circuit court used information unavailable to the jury as a basis for increasing the weight it gave to one of the aggravating circumstances. She argues that according to Carroll, the court could use information not available to the jury only to undermine a mitigating circumstance. Specifically, Scott challenges the third paragraph emphasized in the circuit court’s sentencing order.
The Supreme Court’s holding in Carroll did not purport to be an exhaustive list of what the court could consider when sentencing a defendant to death after a jury has recommended a sentence of life imprisonment without the possibility of parole. ■ .A defendant in a capital-murder case is entitled to an individualized sentencing determination. The circuit court’s order was consistent with the provisions of § 13A-5-47(e), Ala.Code 1975, and with our holding in Harris v. State, 2 So.3d 880 (Ala.Crim.App.2008).
*468 Section 13A-5-47(e), states, in pertinent part:
“In deciding upon the sentence, the trial court shall determine whether the aggravating circumstances it finds to exist outweigh the mitigating circumstances it finds to exist, and in doing so the trial court shall consider the recommendation of the jury contained in its advisory verdict....”
(Emphasis added.)
In Harris, we upheld the circuit court’s override of the jury’s recommendation of life imprisonment without the possibility of parole after the court indicated in its order that it considered evidence outside the record as it related to the aggravating circumstance that two or more persons were killed pursuant to one scheme. We stated:
“In its order, the trial court outlined its reasons for overriding the jury’s verdict recommending a sentence of life without parole. It added that it had seen no case in which a defendant had killed six victims pursuant to one scheme or course of conduct. It cited a number of cases with multiple victims — all of which involved fewer than six victims — in which the trial courts overrode the juries’ recommendations for life in prison without the possibility of parole. In each case, this Court upheld the trial courts’ decisions to override the juries’ recommendations. As the trial court pointed out, when compared with the fact of similar cases, a task the jury could not undertake, ‘the only disproportionate sentence in this case would be to sentence Harris to life without parole instead of death.’ ”
2 So.3d at 930. See also Woodward v. State, 123 So.3d 989 (Ala.Crim.App.2011).
This portion of the circuit court’s order did not violate Carroll and was consistent with the provisions of § 13A-5-47(e), Ala. Code 1975.
C.
Scott next argues that the court erred in discounting evidence because the witnesses and jury were emotional. Specifically, she challenges the first emphasized paragraph in the court’s order.
“[T]he Alabama Supreme Court in Ex parte Taylor, specifically held that it is a valid consideration to consider the emotionalism of the jury when overriding a jury’s recommendation.” 808 So.2d at 1219. Doster v. State, 72 So.3d 50, 121 (Ala.Crim.App.2010). The circuit court committed no error in considering the emotions displayed by the witnesses and the jurors.
D.
Scott next argues that the circuit court erred in considering nonstatutory aggravating circumstances when overriding the jury’s verdict. Specifically, Scott challenges the following portion of the court’s order:
“The jury found [Scott] guilty of three counts of capital murder. In other words, this particular murder fit the definition of three different ways the Alabama legislature has set out to be bad enough to justify capital murder. That is a powerful statement. Not only did [Scott] commit capital murder making her eligible for the death penalty, but three different elements were proven to make her eligible for the death penalty three different ways.”
(C.R.ll) (emphasis added).
Although Scott was charged with and convicted of three counts of capital murder, only one count — murder for pecuniary gain — has a corresponding aggravating circumstance defined in § 13-5-49, Alá.Code 1975, that made Scott eligible for,the death penalty. However, when detailing the ag *469 gravating circumstances in its sentencing order, the circuit court correctly found the existence of two aggravating circumstances: that the murder was committed for pecuniary gain and that the murder was especially heinous, atrocious, or cruel when compared to other capital murders. “Trial courts are presumed to know and to follow existing law.” Harris v. State, 2 So.3d 880, 925 (Ala.Crim.App.2007).
“While the trial court’s sentencing order is defective, the errors are not so egregious or substantial as to require a new sentencing order. ‘The sole purpose of requiring that the trial judge, as the sentencing authority, make a written finding of the aggravating circumstance is to provide for appellate review of the sentence of death.’ Ex parte Kyzer, 399 So.2d 330, 338 (Ala.1981). ‘[T]he harmless error rule does apply in capital cases at the sentence hearing.’ Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983).”
Fortenberry v. State, 545 So.2d 129, 144 (Ala.Crim.App.1988). “[T]his court has before it sufficient basis for reviewing the appellant’s death sentence.” Stewart v. State, 730 So.2d 1203, 1219 (Ala.Crim.App.1996).
It is clear that the above comment was a reference to the severity of the murder and was not the improper application of a nonstatutory aggravating circumstance. Any misstatement in the above paragraph of the circuit court’s order was harmless.
E.
Scott last argues that the circuit court failed to consider uncontested mitigating evidence, i.e., the hardships she had experienced in life, her anxiety disorder, her childhood attention-deficit disorder, and an injury she suffered in college.
“The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance.” Calhoun v. State, 932 So.2d 923, 975 (Ala.Crim.App.2005). “Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.” Harrell v. State, 470 So.2d 1303, 1308 (Ala.Crim.App.1984).
“It is not required that the evidence submitted by the accused as a non-statutory mitigating circumstance be weighed as a mitigating circumstance by the sen-tencer, in this case, the trial court; although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Cochran v. State, 500 So.2d 1161 (Ala. Crim.App.1984), affd in pertinent part, remanded on other part, 500 So.2d 1179 (Ala.1985), affd on return to remand, 500 So.2d 1188 (Ala.Cr.App.), affd 500 So.2d 1064 (AIa.1986), cert, denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).”
Haney v. State, 603 So.2d 368, 389 (Ala.Crim.App.1991). See also Ex parte Hart, 612 So.2d 536, 542 (Ala.1992).
The circuit court’s order clearly reflects that it considered all mitigating evidence that had been offered by Scott. All that is required is that the court consider the evidence, whether it is found to be mitigating is within the discretion of the court. See Haney.
Consistent with the Supreme Court’s holding in Ex parte Taylor, the circuit court considered the jury’s recommendation as a mitigating circumstance and gave it great weight. Unlike Ex parte Tomlin and Ex parte Carroll, the jury neither unanimously recommended a sentence of life imprisonment nor did 10 jurors recom *470 mend a life sentence; only the minimum number required by law recommended that Scott be sentenced to life imprisonment without the possibility of parole. The circuit court complied with Alabama law by setting out its reasons for declining to follow the jury’s recommendation. We can find no legal basis for disturbing the circuit court’s sentence in this case.
XXII.
Section 13A-5-53, Ala.Code 1975, requires that we address the propriety of Scott’s capital-murder conviction and her sentence of death. Scott was indicted for, and was convicted of, murdering six-year-old Mason during the course of an arson and for pecuniary gain, violations of § 13A-5-40(a)(7), (a)(9), and (a)(15), Ala.Code 1975. The jury recommended, by a vote of 7 to 5, that Scott be sentenced to life imprisonment without the possibility of parole. The circuit court chose not to follow the jury’s recommendation and sentenced Scott to death.
The record shows that Scott’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The circuit court found as aggravating circumstances that the murder was committed for pecuniary gain, § 13A-5-49(6), Ala.Code 1975, and that the murder was especially heinous, atrocious, or cruel as compared to other capital murders, § 13A-5-49(8), Ala.Code 1975. The court found the existence of one statutory mitigating circumstance, that Scott had no significant history of prior criminal activity. See § 13A-5-51(1), Ala.Code 1975. The circuit court found the following nonstatu-tory mitigating circumstances:
“[Scott] presented testimony from family and friends that indicated they loved her and did not want to see her die. They testified to the detrimental effect this would have on her living minor son and the remainder of her family. The Court does consider the impact on her family, particularly her younger son, and gives this circumstance its due weight.
“Testimony was given that [Scott] had helped people throughout her life and had performed good deeds. The Court finds that this is a mitigating factor and gives it is due weight.
“The final nonstatutory mitigating factor is the jury’s'recommendation of life without parole....
“Ex parte Carroll sets out that the weight to be given the mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole. In Carroll, 10 jurors recommended life without parole. In the present case, seven made such a recommendation, the statutory minimum to allow a life without parole recommendation.”
(C.R.12.) The circuit court concluded by stating that it gave “heavy weight” to the jury’s recommendation. However, the court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Scott to death.
This Court has independently weighed the aggravating circumstances and the mitigating circumstances as required by § 13A-5-53(b)(2), Ala.Code 1975, and is convinced, as was the circuit court, that death was the appropriate sentence for the horrific murder of six-year-old Mason.
Neither is Scott’s death sentence disproportionate nor excessive as compared to the penalties imposed in similar cases. See Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009); Smith v. State, 908 So.2d 273 (Ala.Crim.App.2000); Sockwell v. State, 675 So.2d 4 (Ala.Crim.App.1993).
*471 Last, as required by Rule 45A, Ala. R.App. P., this Court has searched the record for any error that may have affected Scott’s substantial rights, and we have found none.
For the forgoing reasons, we affirm Scott’s capital-murder convictions and her sentence of death.
AFFIRMED.
WINDOM, P.J., and KELLUM, BURKE, and JOINER, JJ., concur.

. Pursuant to Rule 18.2(b), Ala. R.Crim. P., we requested that the circuit clerk forward the juror questionnaires to this Court.

. Our neighboring State of Mississippi has held: "We decline to set any limits on the prosecutor’s use of any legitimate informational source heretofore or hereafter available as to jurors.” Lockett v. State, 517 So.2d 1346, 1352 (Miss.1987).

. C.L.Y. cites § 265.01(2) of the fifth edition of McElroy’s Alabama Evidence. This section remains unchanged in the sixth edition, which was published in 2009.

. Section 13A — 5—46(f), Ala.Code 1975, provides: “The decision of the jury to return an advisory verdict recommending a sentence of *463 life imprisonment without parole must be based on a vote of a majority of the jurors.”